UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

v.

MARK AROME OKUO, a/k/a "Anthony Terry," a/k/a "Mark Robert," a/k/a "Frank Michael," a/k/a "Romeih Johnson," a/k/a "Williams Francis,"

Defendant.

No. 21-MJ-06204-MPK

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF MOTION FOR DETENTION**

The United States of America respectfully submits this memorandum in support of its motion to detain Defendant Mark Arome Okuo pursuant to 18 U.S.C. § 3142(f)(2)(A).

The Defendant is a paradigmatic flight risk. He is a 41-year-old Nigerian citizen who has no legal immigration status in the United States. Since entering the country for the first time five years ago, he has possessed at least five forged Nigerian passports and used several of them in furtherance of a fraud scheme. Those passports, which the Defendant either acquired or created, are sophisticated and appear authentic, bearing the Defendant's photograph, holograms, and even fake visa stamps. Further, the Defendant has essentially no ties to the United States to keep him here: no children; no other immediate family; no property; and no ability to obtain lawful employment. Conversely, he has firm roots in Nigeria, where he has lived nearly his entire life, and where his entire immediate family, one child, and significant financial resources await him.

Facing already strong evidence, a growing investigation, a lengthy potential prison term, and deportation, the Defendant has no reason to stay, every reason to leave, and the means to obtain yet another fake passport and flee. A preponderance of the evidence establishes that the Defendant poses a serious risk of flight and that no combination of conditions will assure his appearance.

## I. BACKGROUND

The Defendant is a 41-year-old Nigerian citizen with no legal immigration status in the United States.[1] Ex. 1 at ¶ 7 & n.1 (Affidavit of Special Agent Brendan Cullen in support of Complaint and Application for Search Warrants). The Defendant is presently charged by criminal complaint with one count of conspiracy to commit bank and wire fraud, in violation of 18 U.S.C. § 1349, arising out of romance scams and pandemic unemployment fraud. *Id.* at ¶¶ 2–3, 9–10, 38.

As detailed in the 134-paragraph complaint, shortly after entering the United States in 2016 on a tourist visa, the Defendant began using fake passports to open fraudulent bank accounts in the names of aliases. *Id.* at ¶¶ 96–103 & Fig. 21–25 (photographs of Okuo opening and withdrawing funds from accounts in the names of "Frank Michael" and "Mark Robert"). Over the following three years, the Defendant, and his co-conspirator and co-defendant Florence Musau, used at least five forged passports—in the names of "Anthony Terry," "Frank Michael," "Mark Robert," "Precious Adams," and "Catherine Muthoki"—to open and withdraw funds from more than ten fraudulent bank accounts. *Id.* at ¶¶ 38–106.

Those bank accounts controlled by the Defendant and his co-conspirator received the proceeds of romance scams and fraudulent pandemic unemployment claims. *Id.* at ¶¶ 11–37. And shortly after receiving those fraud proceeds, the Defendant and his co-conspirator quickly executed repeated structured withdrawals using aliases and fake passports to evade detection. *Id.* at ¶¶ 42, 49–51, 71–73, 81, 89–91. For example, on or about February 15, 2019, the woman known as "Victim-1" wired $15,000 to a bank account in the name of "Anthony Terry," believing that the

[1] Additional information regarding the Defendant's personal history and characteristics, including his lack of ties to the United States and immigration history, is discussed below. *See infra* Part III.C.

funds were destined for a purported member of the United States military serving a tour of duty in the Middle East with whom she had developed an online relationship. *Id.* at ¶¶ 12–17. Two days later, the Defendant was photographed while withdrawing those romance scam proceeds—in one of many structured withdrawals around Boston—from the account using the name "Anthony Terry." *Id.* at ¶ 42; *see also* Exs. 2.32, 2.33.

The complaint's allegations are merely the tip of the iceberg. The Defendant has been captured by bank and ATM surveillance cameras on dozens of occasions (i) using fake passports to open bank accounts (often using his home address and personal e-mail accounts), and (ii) executing structured withdrawals of fraud proceeds from those accounts, in furtherance of the conspiracy. *See, e.g.*, Exs. 2.1–2.33 (selection of photographs of Okuo opening accounts and executing transactions as Anthony Terry, Mark Robert, and Frank Michael). Further, the complaint was filed without the benefit of returns from search warrants for the Defendant's e-mail accounts, residence, and cell phones. That evidence (discussed in further detail below)—including, among other things, additional fraudulent passports and identification documents that the government did not know about, more than $102,000 in cash, more than 200 reloadable debit cards (many of which bear the names of other people), and chats between the Defendant and romance scam victims—remains under investigation. *See infra* Parts III.A, III.B.

## II. <u>LEGAL FRAMEWORK</u>

Under the Bail Reform Act, courts are empowered detain defendants pending trial if they pose a "serious" risk of flight. *See* 18 U.S.C. §§ 3142(e), (f)(2)(A). A defendant's right to bail "is not absolute," and "[w]here risk of flight is unusually great, a court may deny bail and keep a defendant in custody to insure that the trial will take place." *United States v. Acevedo-Ramos*, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.); *see also United States v. Abrahams*, 575 F.2d 3, 4, 8

(1st Cir. 1978) (affirming pre-trial detention order where Magistrate Judge found "risk of flight [was] immeasurable" because defendant had, *inter alia*, used aliases, transferred money abroad, and generally engaged in alleged offense conduct involving "subterfuge, deceit and cunning").[2]

When seeking detention based on flight, the government is required to "establish[], by a preponderance of the evidence, that there is a serious risk that [the defendant] will not appear," and that "no condition or combination of conditions will reasonably assure his appearance." *United States v. Mehanna*, 669 F. Supp. 2d 160, 164–65 (D. Mass. 2009) (Sorokin, J.) (ordering defendant detained based on risk of flight); *see also United States v. Pereira*, No. 19-10446-RGS-MPK, 2020 WL 2324054, at *1 (D. Mass. May 10, 2020) (ordering detention based on risk of flight during pandemic era: "I also agree with [this Court's] finding that, given [the defendant's] family ties to Cape Verde, a preponderance of the evidence supports a finding that he poses a risk of flight."); *United States v. Vidarte-Hernandez*, No. 19-40049-TSH-MPK, 2020 WL 4813356, at *3 (D. Mass. Aug. 19, 2020) (same, citing "significant family ties to [defendants'] home countries where they would be deported [upon conviction]" in affirming this Court's order of detention based on risk of flight for two defendants, even though they were U.S. lawful permanent residents,

[2] *See also, e.g.*, *United States v. Valdivia*, 104 F. App'x 753, 754 (1st Cir. 2004) (affirming pre-trial detention order and finding serious risk of flight based on defendant's "strong connections" to "foreign countries," despite his "strong family ties [to the jurisdiction]," "steady and gainful employment history," and "his relatives' willingness to take custody of him and help finance his bail"); *United States v. Hussain*, 6 F. App'x 50, 51 (1st Cir. 2001) (affirming pre-trial detention order based on risk of flight for defendant who was citizen of foreign country with minimal ties to the United States); *United States v. Jones*, 201 F.3d 429 (1st Cir. 1999) (affirming pre-trial detention of United States citizen and finding that defendant's "use of aliases also support the risk of flight determination"); *United States v. Craven*, 181 F.3d 80 (1st Cir. 1998) (affirming pre-trial detention order based on risk of flight even where defendant's young child and girlfriend lived in Massachusetts, and family was willing to post over $100,000 of equity in Massachusetts residence as security).

had lived in Massachusetts a combined 23 years, and had significant others and children living in Massachusetts).

The Bail Reform Act sets forth three factors in considering a defendant's risk of flight: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the defendant; and (3) the history and characteristics of the defendant, including his family ties to the jurisdiction, employment, financial resources, length of residence in the community, and other community ties. *See* 18 U.S.C. § 3142(g). A rebuttable presumption in favor of detention does not apply here. *See* 18 U.S.C. § 3142(e)(3).

## III. ANALYSIS

The Defendant faces strong evidence of his participation in a fraud conspiracy, including most relevant here, his use of fake passports and aliases to access the fraud proceeds. With no roots in the United States, the Defendant has significant familial connections and financial resources abroad. All three factors under 18 U.S.C. § 3142(g) weigh in favor of detaining the Defendant, and accordingly, the government has proven by a preponderance of the evidence that the Defendant poses a serious flight risk. Further, there are no set of conditions that will reasonably assure the Defendant's appearance for the remainder of the case.

### A. The Nature of the Defendant's Crimes Demonstrates a Serious Risk of Flight.

The nature and circumstances of the crimes charged—using fake passports and aliases to open bank accounts and withdraw the proceeds of a fraud conspiracy—underscore the Defendant's risk of flight and therefore support detention.

It is well-established, both within and outside the First Circuit, that a defendant's use of aliases and possession of fraudulent identification documents (or even the mere ability to *obtain* such documents) justify a finding that he poses a serious risk of flight. *See, e.g.*, *United States v.*

*Jones*, 201 F.3d 429, 1999 WL 668516, at *2 (1st Cir. 1999) ("The magistrate-judge's findings on [the defendant's] use of aliases also support the risk of flight determination."); *United States v. Femia*, 983 F.2d 1046, 1993 WL 5893, at *6 (1st Cir. 1993) (concluding with "little difficulty" that, among other things, "use of aliases amply supported" finding that the defendant posed a risk of flight); *United States v. Santana*, No. 09-10315-NG, 2010 WL 2427457, at *1 (D. Mass. June 10, 2010) (Gertner, J.) (denying motion to revoke detention order based on risk of flight and noting that defendant "had access to false identification documents" and helped another individual "acquire a false passport").[3]

Here, the Defendant has obtained or created, and used or otherwise possessed, at least ***five*** forged Nigerian passports.

- As detailed in the Complaint, since 2017, the Defendant has used fake passports in the names of his aliases "Mark Robert," "Frank Michael," and "Anthony Terry" to open bank accounts in and around Boston in furtherance of the fraud scheme. *See* Ex. 1, ¶¶ 39–40, 97, 102 & Fig. 4. For example, Okuo was photographed on February 11, 2020 withdrawing money from an account in the name of "Anthony Terry" and handing a bank teller the fake Terry passport, with the withdrawal receipt recording the fraudulent passport number. *See* Ex. 2.15; Ex. 3.

- A search warrant executed on one of the Defendant's e-mail accounts revealed another, fourth, forged passport in the name of "Williams Francis," an alias that was previously unknown to the government. *Compare* Ex. 4 (Williams Francis passport found on

[3] *See also, e.g.*, *United States v. Attia*, 2020 WL 2615725, at *1 (D. Md. May 22, 2020) (detaining defendant because "she used a counterfeit passport to further the fraud" and "an executed search warrant on her home and email yielded fraudulent passports [and] drivers licenses"); *United States v. Benatar*, 2002 WL 31410262, at *2 (E.D.N.Y. Oct. 10, 2002) (Gleeson, J.) ("These licenses, which all bear [the defendant's] photo, establish a propensity and ability to obtain official, government-issued identification in false names . . . his track record of procuring documents that would permit him to live and travel under an assumed name ***is especially troublesome***.") (emphasis added); *United States v. Hollender*, 162 F. Supp. 2d 261, 269 (S.D.N.Y. 2001) (McMahon, Chief J.) (finding defendant posed a serious risk of flight based on use of forged passports: "This Court ***cannot overemphasize*** its concern about the possibility that a person skilled in identity theft and the creation of forged documents using a computer may employ that skill to facilitate flight.") (emphasis added).

Defendant's e-mail account with photograph of the Defendant), *with* Ex. 5 (photograph found on the same e-mail account of the Defendant holding his real, expired passport).

- A search warrant executed at the Defendant's apartment uncovered yet another—*fifth*—forged passport in the name of the previously unknown alias "Romeih Johnson" with a photograph of the Defendant, plus a fake Nigerian driver's license. *See* Ex. 6 (Romeih Johnson passport and driver's license); Ex. 7 (Romeih Johnson identification documents compared to Defendant's real passport). E-mails sent by banks to one of the Defendant's e-mail accounts and mail found in the Defendant's apartment regarding bank accounts in the name of "Romeih Johnson" suggest that the fraud alleged in the complaint has continued under new aliases. *See, e.g.*, Ex. 8 (e-mail from Santander Bank to Okuo e-mail account addressed to Romeih Johnson, showing available balance of more than $25,000 and structured transactions); Ex. 9 (e-mail from Citizens Bank to Okuo's e-mail account addressed to Romeih Johnson regarding suspicious withdrawals); Ex. 18 (mail from Santander Bank found in Okuo's residence addressed to Romeih Johnson, enclosing debit card).

Even more concerning, the forged passports are sophisticated and appear legitimate. For example, the Williams Francis and Romeih Johnson passports bear the Defendant's photograph and holograms (*see* Exs. 4, 6), and the latter even includes a fake U.S. visa and fake U.S. Customs and Border Protection stamps indicating that "Romeih Jonson" purportedly entered the United States in New York on a visitor visa in 2019. *See* Ex. 10 (Romeih Johnson visa and stamps).






Fake identification documents of this quality are easily sufficient for the Defendant to flee, cross the border to a neighboring country, and disappear. And if the Defendant was willing to acquire (or create) five forged passports merely to further a fraud scheme, it bears consideration how many he would be willing to obtain to return to his family in Nigeria and avoid incarceration in a country where he has no ties and from where he will certainly be deported. While the defendant's crimes are non-violent, that carries little weight in evaluating his risk of *flight*, and his use of sophisticated forged passports to engage in "subterfuge, deceit and cunning . . . justifies pretrial detention." *Abrahams*, 575 F.2d at 8.

**B. <u>The Weight of the Evidence Supports Detention</u>.**

The strength of the evidence against the Defendant—even just on the face of the 134-paragraph complaint—is strong and favors detention. *See, e.g. United States v. Vidarte Hernandez*, No. 19-40049-TSH-MPK, ECF No. 171 (D. Mass. July 31, 2020) (detention order based on risk of flight for U.S. legal permanent resident who "is facing a very strong government case" and "will serve time and then will undoubtedly be deported" if convicted, because "[i]t is hard to imagine why he would stay in the United States, only to suffer this fate"). As noted, the complaint details numerous instances—many caught by surveillance cameras and all corroborated

by voluminous bank records—of the Defendant using fake passports to open a bank account in the names of aliases (but with his home mailing address and personal e-mail accounts), and then executing structured withdrawals of fraud proceeds. *See supra* Part I; *see also* Exs. 2.1–2.33. Based on the weight of the evidence at this time, a conservative estimate of the Defendant's Guidelines sentencing range on the complaint's allegations is 70 to 87 months of incarceration.[4]

But there is more. The weight of the evidence has only continued to grow since the filing of the complaint:

- Search warrants for the Defendant's e-mail accounts have produced, among other things, numerous e-mails from banks regarding the fraudulent bank accounts in the names of Okuo's aliases (alongside e-mails addressed to the Defendant personally). *See, e.g.*, Ex. 1 at ¶¶ 47–51 (discussing Santander account in the name of Anthony Terry opened on September 16, 2019 and fraud committed on Victim-3 and Victim-4); Ex. 11 (September 16, 2019 e-mail from Santander to Okuo's e-mail account congratulating "Anthony Terry" on activating online banking for the Santander Terry account); Ex. 12 (e-mail to same account a few weeks earlier from Nigerian bank Zenith to "Mark Arome Okuo" about his bank balance).

- A search warrant for the Defendant's apartment and his car uncovered, among other things, (i) more than $102,000 in cash hidden throughout the residence, (ii) clothes worn by Okuo in opening accounts and withdrawing funds from the fraudulent bank accounts in the names of aliases, and (iii) additional fake identifications with Okuo's photograph and bank records in the name of that alias. *See* Exs. 13.1–13.2 (cash); Ex. 14 (Arsenal soccer jacket); Ex. 2.6 ("Anthony Terry" executing bank transactions wearing same jacket); Exs. 6–9, 10, 18 (Romeih Johnson identification documents and bank records).

- Finally, even only preliminary searches of the *six cell phones* belonging to the Defendant have revealed, among other things, (i) photographs of withdrawal receipts showing wire transfers from victims identified in the complaint, as well as bank account information for Okuo's aliases, and (ii) messages with additional romance scam victims. *See, e.g.*, Ex. 15 (picture on Okuo's cell phone of wire transfer from Victim-2 to Precious Adams account); Ex. 16 (picture on Okuo's cell phone of account information for Santander account in the name of Anthony Terry, to which Victim-3 and Victim-4 sent romance scam funds); Ex. 17 (chat on Okuo's cell phone with

[4] *See* U.S.S.G. §§ 2B1.1(a)(1), 2B1.1(b)(1)(H), 2B1.1(b)(2)(A)(ii), 2B1.1(b)(10), and 2B1.1(b)(11).

middle-aged woman, asking his "love" and "honey" to send money to his "nephew" in the United States).

If the weight of that evidence were not enough to support a finding that the Defendant poses a strong risk of flight, he also waived his *Miranda* rights after being arrested, signed a written waiver of his *Miranda* rights, and proceeded to provide inculpatory statements to agents. *See* Ex. 29; *see also United States v. Hussain*, 6 F. App'x 50, 51 & n.3 (1st Cir. 2001) (affirming pre-trial detention order, finding that defendant posed serious risk of flight, in part, because he "made incriminating statements to the authorities," and noting that the mere "possibility" of a motion to suppress "does not provide a sound reason" in favor of release).

Further, the scope of the investigation has also grown since the government moved for detention upon Okuo's arrest, and that investigation is ongoing. While executing a search warrant at the Defendant's residence, agents found hidden throughout the apartment *more than two-hundred* reloadable debit cards, many of which bore the names of other people. *See* Exs. 19.1–19.7. These cards were stored among (i) paperwork indicating that they contain the proceeds of fraudulent pandemic unemployment claims, (ii) mail addressed to other people from state unemployment agencies and mail addressed to other people enclosing debit cards, and (iii) ledgers bearing the name "Arome," which is Okuo's middle name, appearing to show withdrawals from these cards. *See* Ex. 19.1 (cards stored with hand-written note regarding website for Massachusetts "pandemic unemployment stimulus"), Ex. 20 (mail examples), Ex. 21 (ledger examples); *see also* Ex. 1 at ¶ 30 (explaining that pandemic unemployment assistance can be provided by states on debit cards). Recent text messages between Okuo and his co-defendant and co-conspirator Florence Musau appear to show Okuo instructing Musau to withdraw funds from these debit cards. *See* Ex. 22. And finally, in one particularly concerning example of the Defendant's sophistication that the government will explain in more detail during the detention hearing—from *the night*

*before* he was arrested, March 24, 2021—it appears that the Defendant has recently begun to use disguises and change clothes when executing structured withdrawals from cards in other people's names. *See* Ex. 23. The investigation of this evidence is underway and ongoing.

**C. <u>The Defendant's Lack of U.S. Ties Demonstrates a Serious Flight Risk</u>.**

The Defendant also poses a serious risk of flight because he has essentially zero ties to the United States, and he has significant familial and financial ties to Nigeria.

The 41-year-old Defendant is not a United States citizen or even a lawful permanent resident.[5] In 2016, the Defendant entered the United States on a temporary six-month tourist (B-2) visa from Nigeria, where he is a citizen. *See* Ex. 24 at 2–3 (Okuo Form I-485). After that visa expired, he purportedly married a United States citizen, and that citizen filed a petition for adjustment of immigration status on his behalf. *Id.* During an interview with an officer of the United States Citizenship and Immigration Services ("USCIS") regarding that petition, Okuo and his purported wife provided evasive and untruthful answers under oath. *See* Ex. 25 (Okuo USCIS decision). In January 2019, USCIS denied the petition, concluding that the marriage was fraudulent and that Okuo entered into it "solely to avoid the immigration laws of the United States." *See id.* at 7. Presently, the Defendant has no legal immigration status in the United States.

[5] The government acknowledges that three defendants in a different case, involving a similar fraud, were released on conditions. *See United States v. Osemwegie et al.*, No. 21-mj-04101-DHH. One of those defendants—Macpherson Osemwegie—is a citizen of the United States. The other two defendants—Osaretin and Henry Omoruyi—are lawful permanent residents. Those defendants—with legal status in the United States and significant familial and community ties to Massachusetts—pose a significantly lower risk of a flight risk than Okuo, a Nigerian citizen with no legal status in, or familial ties to, the United States.

The Defendant's sham marriage may be the only significant connection he has to the United States.[6] He has no children in the United States, and he has no other immediate family in the country either. *See* Ex. 26 at ¶¶ 3–4 (Okuo affidavit submitted in support of immigration petition, stating that his entire immediate family and one child all live in Nigeria). He does not own any property in the United States. He does not have a driver's license in any state. And he does not have the ability to legally obtain employment in the country.

Conversely, the Defendant has overwhelming connections to Nigeria. He has lived in Nigeria for essentially his entire life. *See* Ex. 24 at 5. The Defendant's only child and his entire immediate family reside in Nigeria. *See* Ex. 26. He has a Nigerian bank account that currently has more than $200,000 in U.S. dollars (77 million Naira); and tellingly, the Defendant had only approximately $14,000 in that account earlier in the fraud scheme. *See* Exs. 12, 27. Also concerning, agents found hand-written evidence that, in the days leading up to his arrest, the Defendant was attempting to transfer a significant amount of that money (approximately $144,000) out of his name to a family member in Nigeria. Ex. 28.

In short, the Defendant has every reason to flee and almost no reason to stay. Given his utter lack of ties to the United States and significant connections to Nigeria, there "is no incentive for [the Defendant] to remain in the United States to face th[e] charges given the overwhelming evidence against [him] and the near certainty of deportation . . . after serving a sentence." *United States v. Vidarte-Hernandez*, No. CR 19-40049-TSH-MPK, 2020 WL 4813356, at *3 (D. Mass. Aug. 19, 2020).

---

[6] Based on the government's investigation, the Defendant's purported wife has never lived with the Defendant. Since at least November 2020, the Defendant has been living with his co-defendant, Florence Musau. *See* Ex. 1 at ¶¶ 7–8.

**D. <u>No Set of Conditions will Reasonably Assure the Defendant's Appearance</u>.**

Having demonstrated by a preponderance of the evidence that the Defendant poses a serious flight risk, the government submits that there are no conditions that will reasonably assure the Defendant's appearance.

The Defendant owns no property in the United States to post as collateral. Nor does he have any family in the United States with the ability to do so. The Defendant does not have any reliable family member who can agree to assume his supervision or act as a custodian. The Defendant cannot seek lawful employment to support himself financially. *See United States v. Akula*, No. 19-30039-MGM, 2020 WL 3496693, at *2 (D. Mass. June 29, 2020) (ordering defendant detained based on risk of flight because "[a]t this time, he does not have a visa authorizing him to work in the United States[,] [i]f convicted, [he] would likely be subject to deportation after serving any period of incarceration, [and t]he court still lacks evidence that [he] has family ties in this district . . . or anywhere in this country, that equal or outweigh his ties to India").

Further, ordering the Defendant to surrender all passports—real and fake—carries little weight when he has repeatedly demonstrated the ability and willingness to obtain and/or create forged passports in furtherance of his fraud. There is no condition, except detention, that will prevent the Defendant from obtaining yet another forged passport bearing his photograph and disappearing.

Additionally, the imposition of GPS monitoring will not reasonably assure the Defendant's appearance. As an initial matter, it remains unclear to where (if anywhere) he could be released—and where the GPS unit would be based—because he lived in an apartment in Canton with his co-defendant Florence Musau, with whom he should not be in contact. *See* Ex. 1 at ¶¶ 7–8. Further,

the government understands that the Canton apartment complex where Mr. Okuo resided has initiated eviction proceedings. In any event, "while increasing the likelihood that flight will be *detected* . . . electronic monitoring is not always effective [at preventing flight.]" *United States v. Cruz-Reyes*, 229 F.3d 1134 (1st Cir. 2000). If mere GPS monitoring is sufficient to reasonably assure the appearance of *this* Defendant—a Nigerian citizen without any lawful immigration status or family in the United States who has possessed and used at least five different forged passports—it is difficult to imagine *any* defendant whose circumstances warrant pre-trial detention based on a risk of flight.

## IV. **CONCLUSION**

The government acknowledges that under the Bail Reform Act, detention based on a risk of flight is the exception rather than the rule, particularly during the pandemic era.[7] Nevertheless, the Defendant is a Nigerian citizen who has used or possessed at least five forged passports, has no legal immigration status in the United States, and has all of his familial and community roots abroad. Accordingly, the government respectfully submits that a preponderance of the evidence establishes that the Defendant poses a serious risk of flight and that no combination of release conditions can reasonably assure his appearance.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By: /s/ Ian Stearns
Ian Stearns
Assistant United States Attorney
One Courthouse Way, Suite 9200

[7] The Defendant is presently detained at the Wyatt Detention Facility. As of April 1, 2021, Wyatt had zero active cases of COVID-19, and nearly 20 percent of Wyatt detainees have received at least one dose of a vaccine. *See In re Donald W. Wyatt Detention Facility*, No. 20-mc-0004, ECF No. 107 (D. Mass. Apr. 1, 2021).

Boston, MA 02110
617-748-3208
Ian.Stearns@usdoj.gov

Date: April 8, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Ian Stearns
Ian Stearns
Assistant United States Attorney

Date: April 8, 2021