UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ———————————————— ) | | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 21-10309-LTS-MPK |
| | ) | |
| MARK AROME OKUO, a/k/a | ) | |
| Romeih Johnson, a/k/a Frank Michael, | ) | |
| a/k/a Mark Robert, a/k/a Anthony Terry, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— ) | | |

## GOVERNMENT'S SENTENCING MEMORANDUM

A single mother of three who lost more than $100,000.  A widow who was forced to postpone retirement to pay off the home equity loan that she tapped.  A college student who had to work two jobs to recover savings.  A parent who attempted suicide because she could no longer provide for her children.  These romance scam victims were lured into fake online relationships, and as a result, they—like nearly 100 others—sent money to the defendant Mark Okuo.

"Mugu" is what the defendant called those victims in his text messages.  Mugu is Nigerian slang for "fool," or "big idiot."  For four years, he played a critical role in a romance scam conspiracy, using fake passports to open burner bank accounts in Boston and to receive nearly $1.1 million dollars in fraud proceeds.  While he did it, he called his victims "mugu."  And when he got caught, he obstructed justice in several ways, including by telling his co-conspirator "remember you can't say nothing to the FBI . . . if say anything its de end of me."  That co-conspirator, who is significantly less culpable than him in every way, was recently sentenced to 44 months in prison.

For the reasons below, against the backdrop of a Guidelines Sentencing Range ("GSR") of 63 to 78 months in prison, the government respectfully recommends that the Court sentence Okuo to 57 months in prison, 36 months of supervised release, and restitution of $1,091,386.71.

I.       **BACKGROUND**

A.       **Okuo's Offense Conduct**

With two parents who worked as a tailor and teacher to provide for his needs, Okuo had a relatively stable childhood in Nigeria.  PSR ¶¶ 151–53.  He graduated from high school, obtained a graduate degree in accounting, later graduated from college, and generally "received good grades and never had any learning problems."  *Id.* at ¶ 170.  After graduating from college, he worked as a supervisor at a Nigerian real estate company.  *Id.* at ¶ 177.

In 2016, Okuo left Nigeria and entered the United States on a six-month tourist visa, settling in the Boston area.  *Id.* at ¶ 150.  About a month after arriving in the United States, he entered into a sham marriage with a United States citizen residing in Newark, whom Okuo neither lived with nor knew.  *Id.* at ¶¶ 150, 162.  The United States Citizenship and Immigration Services ("USCIS") denied a petition for adjustment of Okuo's status based on that marriage, finding that Okuo and his spouse provided evasive and untruthful answers under oath during interviews, and concluding that Okuo entered into the fraudulent marriage "solely to avoid the immigration laws of the United States."  *Id.* at ¶ 150; *see* Dkt. 17 at 11 (detention motion attaching USCIS decision).

Within a year after entering the United States, Okuo began participating in a fraudulent online scheme, principally involving romance scams, that targeted and preyed upon lonely victims.  *See generally* PSR ¶¶ 9, 37, 38.  The nature of the scheme, the defendant's role in it, and how that role results in the calculation of the applicable GSR are not in dispute (aside from Okuo's post-arrest obstruction of justice and acceptance of responsibility), and the government will not recite it in full here.  *See generally id.* at ¶¶ 9–108.

But in short, as part of the scheme, co-conspirators abroad (*i.e.*, "victim-side co-conspirators") contacted vulnerable individuals via the internet and began online romantic

relationships with the victims under false pretenses. *Id.* at ¶¶ 9, 18–19.[1] After the victim-side co-conspirators developed a relationship of trust with the victims, they asked the victims to send them money, via purported friends or family members in the United States, for a variety of false reasons. *Id.* Meanwhile, co-conspirators in the United States like Okuo (*i.e.*, "money-side co-conspirators") opened fraudulent bank accounts using fake foreign passports and sent the account information and wiring instructions to their co-conspirators abroad. *Id.* When the victims, believing they were assisting their online romantic partners, sent money to the fraudulent bank accounts, Okuo and other money-side co-conspirators like him quickly withdrew the fraud proceeds in numerous repeated structured ATM and teller transactions to evade detection. *Id.* Okuo and his co-conspirators in the United States took a percentage cut for their role in the scheme, before sending the remaining fraud proceeds abroad to the victim-side co-conspirators. *Id.* When a victim reported fraud or a bank raised concerns, Okuo and his co-conspirators abandoned the account, opening another account at a different bank with the same fake identification, or if they felt the alias was compromised, obtaining a new fake passport and repeating the process. *Id.* Additionally, Okuo received approximately $50,000 in proceeds of fraudulent pandemic unemployment claims submitted in victims' names to his bank accounts. *See id.* at ¶¶ 105–06.

There are four aspects of Okuo's offense conduct that make him more culpable than the typical money-side participant in a romance scam scheme.

First, Okuo knew exactly where the money was coming from, grasped that real people were being harmed, and understood that his conduct was not only morally wrong, but against the law. Unlike some less sophisticated "money mules" in similar schemes who know that the proceeds are

---

[1] Although the majority of victims who sent Okuo money were romance scam victims, some were victims of other similar online schemes. *See, e.g.*, PSR at 55–61.

generally the proceeds of *some* type of fraudulent scam, Okuo referred to the scheme's victims as "mugu" or fools.  *Id.* at ¶ 15.   In trying to persuade his girlfriend and principal co-conspirator Florence Musau to open accounts to accept money from one victim, Okuo told her: "Th[is] mugu has paid like 80k, for over six different accounts."  *Id.*  Okuo and Musau subsequently went on to defraud that "mugu"—a single mother of three children—of an additional $137,000.  *Id.* at ¶ 25. As another example, Okuo sent Musau a warning via an encrypted message attaching a news story announcing charges by the U.S. Attorney's Office in Boston against "2 Nigerian nationals [who] used romance, [and] unemployment insurance scams to defraud victims during [the] pandemic," including a defendant who was sentenced by Judge Zobel to 63 months in prison, as discussed below.  *Id.* at ¶ 16.

Second, Okuo exhibited a level of sophistication and willingness to evade detection that eclipses that of most romance scam participants.  For example, unlike many similar defendants (like his girlfriend Musau), Okuo destroyed the fake passports that he used once he realized that the aliases were compromised.  *Id.* at ¶ 13.  Further, when it became more difficult to execute the scheme by opening fraudulent bank accounts (due to both closures of accounts by banks and investigation by law enforcement), Okuo was a key participant in transitioning the scheme to using reloadable debit cards—more than 100 of which were found in his apartment when he was arrested. *Id.* at ¶ 108.  The purpose of using reloadable debit cards was to make the victims' money less traceable and to better insulate co-conspirators like Okuo.  *Id.*

Third, Okuo expanded the scheme by recruiting others, including his girlfriend Musau.  *See id.* at ¶ 12.  Okuo recruited Musau to the scheme; obtained fake passports for her to use; taught her how to open fraudulent bank accounts using burner e-mail accounts; sourced incoming fraud proceeds for her accounts by communicating with victim-side co-conspirators abroad; told her

when and where to withdraw money; and instructed her on how to structure withdrawals to evade detection. *Id.* Importantly, Okuo also took a percentage cut of the proceeds for any victim funds that Okuo sourced for Musau; in text messages with Musau, Okuo called this his "commission." *Id.* Additionally, unlike some romance scam participants (like Musau), Okuo furthered the scheme by working with other money-side co-conspirators. For example, Osaretin Omoruyi (charged in a separate case) told Okuo that he had a "racket" with one victim who sent him $2,000 per month, but he temporarily needed to use one of Okuo's accounts because Omoruyi's accounts were frozen. *Id.* at ¶ 104. Okuo sent Omoruyi the bank account information for one of his aliases, which he used to receive funds from Omoruyi's victim. *Id.*

Fourth, the timeline of Okuo's participation in the scheme is indicative of his culpability. He began participating in the scheme less than a year after entering the country. *Id.* at ¶¶ 9, 37, 38. For four full years, he used fake passports to open bank accounts and withdraw fraud proceeds from victims, and he made no efforts to terminate his conduct. *Id.* at ¶¶ 38, 107. Rather, he became more sophisticated and involved over time—both in how he executed the scheme and how he covered his tracks—and he continued his conduct up to the moment of his arrest. *Id.* at ¶ 107.

In total, over four years, Okuo and Musau used seven fake passports and aliases (four of which were Okuo's), opened nearly 20 fraudulent bank accounts (at least a dozen of which were Okuo's), and received and withdrew nearly $1.1 million in fraud proceeds.[2] *Id.* at ¶¶ 11, 114.

### B.   Okuo's Victims

Okuo's conduct directly affected approximately 102 victims, who suffered losses ranging from a couple thousand dollars to a couple *hundred* thousand dollars. *See id.* at ¶ 114. As

---

[2] Further, these figures do not include approximately $485,527 in suspected fraud proceeds that had been loaded on to more than 100 reloadable debit cards that were seized from Okuo's apartment, which the government has not successfully, to date, traced to identifiable victims.

exemplified by the victim impact statements attached to the PSR, the financial and emotional damage inflicted by the scheme on these victims was devastating.

One victim explained how she was lured into an online relationship with someone who she believed was a U.S. Army soldier stationed in the middle east—a story that was typical for many victims of the scheme.  PSR at 52.  The victim, a widow who lost nearly $40,000, describes how she now has to work two jobs in her retirement to payoff the home equity line of credit from which she withdrew the funds.  *Id.*  She was "on [the] edge of financial ruin," and "still find[s] it hard to make the payments so I don't lose my house."  *Id.* at 52–53.  The financial impact on her has not lapsed, as she has suffered lingering consequences to her credit and ability to obtain loans.  *Id.* at 53.   In addition to the financial loss, she suffers emotional damage and has been unable to seek support from family and friends due to her feelings of shame and embarrassment.  *Id.* at 52.  She is "worried [about] being able to have enough money to live on," and is "afraid to tell anyone [about] this scam."  *Id.* at 53.

Another victim, a divorced mother of several children, describes how she was lured into an online relationship with another "soldier" purportedly stationed in the middle east, and how over the course of six months, he groomed her and bilked her for money.  *Id.* at 68.  She recounts how she was pressured to send him thousands of dollars to ensure his release from military service, including through pictures of war atrocities:  "[O]f someone's leg that had a broken bone with blood everywhere . . . and another photo of a body, head covered, whose chest was destroyed due to a bomb explosion."  *Id.*  After she had sent the defendant all of her money, she was directed to sell jewelry and accessories in order to send more money.  *Id.* at 69.  When she stopped sending money, the victim-side co-conspirator threatened her and her family.  *Id.*  And unfortunately as is common in many romance scam cases with international scope, she received little assistance after

reporting the fraud and abuse to the local police.  She attempted suicide because she "couldn't provide for [her] children."  *Id.*  Her description of the lasting financial and emotional impact of the crime on her is on all fours with scholarship (*see infra* Part III.C) exploring the effects of romance scams on victims:

> This whole situation has had a massive tol[l] on my mental health and affected me massively financially.  I already had depression for over 20 years but this situation put me into a deep depression and I tried to kill myself as I couldn't provide for my children and pay my bills for a few months because I had given all my money to this man.  I had to ask my neighbor and one of my brothers to lend me money so I can pay off my bills and debts and eventually, after a long while, was able to pay it back.  I had to keep this a secret from my children as I was ashamed until my daughter found out . . . and had to support me mentally and emotionally as I became a wreck.  I have never been the same since . . . and I am still affected by this . . . .

*Id.*

Another victim recalls "spen[ding] three years online with a deceitful man and who manipulated me out of" thousands of dollars.  *Id.* at 70.  She describes the lasting effects on her life: "This whole ordeal has taken its toll on me physically and emotionally.  The mental anguish never subsides.  My faith and trust in people has been destroyed. . . . [T]he romance scammer was not at all lenient with me, all lies and he is a thief who treated me like human trash."  *Id.*

These victim impact statements are only the tip of the iceberg.  Several victims who cooperated with the government's investigation have declined to submit such statements, principally to avoid reliving the effects.  For example, Victim-1, a divorced mother of three children who lost more than $100,000 at the hands of Okuo and Musau—and one of the victims who Okuo referred to as a "mugu"—has previously described to the government her mental, emotional, and financial distress caused by this scheme.  *See generally id.* at ¶¶ 20–25, 130.

### C.    Okuo's Obstruction of Justice

Shortly after his arrest on a complaint, Okuo obstructed justice in several ways.  *Id.* at ¶¶ 109–13.  First, he pressured his co-defendant Musau to lie to investigators about several things,

including where she obtained her false passports.  *Id.* at ¶ 110.  Second, Okuo attempted to persuade Musau not to cooperate with the government, telling her, among other things, "remember you can't say nothing to the FBI . . . if [you] say anything its de end of me."  *Id.* at ¶ 111.  Third, Okuo sent Musau a message containing a threat to a government attorney: "I'm tired of de lies from government the prosecutor lying about de amount threatening my freedom for speak to you I'm going to show him he can be touched that his family can be touched . . . you just remain silent I am show dem I am not a victim de will be da victim."  *Id.* at ¶ 112.

In a separate jail message, Okuo told Musau that he did not think their conduct was a "big thing," and that this is not a "murder case."

## II.   <u>APPLICABLE SENTENCING GUIDELINES</u>

There appear to be only two Guidelines issues for the Court to resolve at sentencing.  The first is a 2-level enhancement for obstruction of justice.  Both the government and Probation agree that this enhancement should apply, and while it is not agreed-upon in the parties' plea agreement, the government understands the defendant does not intend to dispute it at sentencing.  The second is a 3-level reduction for acceptance of responsibility, which consistent with the parties' plea agreement, the government and the defense agree should apply, contrary to the PSR's conclusion.

### A.   <u>The Plea Agreement</u>

As set forth in the parties' plea agreement, the parties agree that Okuo's total offense level is no less than 24, based on the following:

- a base offense level of 7 under Section 2B1.1(a)(1);

- a 14-level increase for the loss amount under Section 2B1.1(b)(1)(H);

- a 2-level increase because the offense involved 10 or more victims and resulted in substantial financial hardship to one or more victims under Section 2B1.1(b)(2)(A);

- a 2-level increase because a substantial part of the scheme was committed from outside the United States under Section 2B1.1(b)(10);

- a 2-level increase because the offense involved the possession or use of an authentication feature (here, Okuo's use of fake passports that contained holograms) under Section 2B1.1(b)(11)(A)(ii);[3] and

- a 3-level reduction for acceptance of responsibility under Section 3E1.1.

**B.**     **Obstruction of Justice**

The government submits—and Probation agrees—that Okuo's post-arrest communications with Musau warrant a 2-level enhancement for obstruction of justice under Section 3C1.1.  *See* PSR ¶ 135.  Although the defendant did not stipulate to this enhancement in his plea agreement, the government's understanding is that the defendant does not intend to dispute the applicability of this enhancement at sentencing.  Nevertheless, should he dispute it, the weight of authority is clear that the enhancement applies under these circumstances.

---

[3] The government is aware that in *United States v. Osei*, 21-cr-10064-IT, the court declined to apply this enhancement, concluding that such an enhancement applies only if the false identification document relates to an "actual person."  The government and Probation here disagree with that conclusion, and the government submits that there is no other authority supporting this interpretation of Section 2B1.1(b)(11).  The enhancement applies because the holograms on Okuo's fake passports are "authentication features," under Section 2B1.1(b)(11)(A)(ii), and therefore the definition of "means of identification" under Section 2B1.1(b)(11)(C)(i) is not implicated at all.  *Compare* U.S.S.G. § 2B1.1(b)(11)(A)(ii) and App. n. 10(A) (defining "authentication feature"), *with id.* § 2B1.1(b)(11)(C)(i) and App. n. 1 (defining "means of identification").  Indeed, the Fifth Circuit recent explained that there is a "lack of authority" for this exact interpretation.  *See United States v. Aderinoye*, 33 F.4th 751, 755 (5th Cir. 2022) (noting a "lack of authority" for the argument that a fake passport cannot trigger this enhancement because it does not "relate to an actual person"); *see also United States v. Azubuike*, 743 F. App'x 958, 960 (11th Cir. 2018).  Because all parties here—the government, the defense, and Probation—agree that the enhancement applies, the government will not belabor the issue, but is willing to submit supplemental briefing should the Court request it.

Generally, the First Circuit has held that Section 3C1.1's "application notes make pellucid that obstruction of justice is capacious enough to encompass a broad swathe of conduct." *United States v. Nygren*, 933 F.3d 76, 84 (1st Cir. 2019); *see also United States v. Voccola*, 99 F.3d 37, 46 (1st Cir. 1996) (The "Application Notes are plain that a wide range of conduct will suffice to properly enhance a sentence for obstruction of justice.").  But falling squarely within that "broad swathe" is telling a potential witness "not to talk to anyone" and not to cooperate with investigators.  *Voccola*, 99 F.3d at 45–46 ("[C]ontrary to what defendant argues, § 3C1.1 does not require the existence of threats in order to apply.  A court may find that defendant 'obstructed or impeded' an investigation without resorting to threats to obtain a witness's cooperation."); *see also United States v. O'Brien*, 870 F.3d 11, 18 (1st Cir. 2017) ("Attempting to influence a witness not to cooperate with the government . . . is just the type of conduct covered by § 3C1.1.").

Further, enhancements for obstruction are warranted where a defendant attempts to influence testimony of a potential witness or affect what a potential witness tells law enforcement.  *See United States v. Monell*, 801 F.3d 34, 47–51 (1st Cir. 2015) (affirming application of enhancement where recordings "supported the inference" that defendant attempted to persuade witness to take responsibility for possession of drugs); *accord United States v. Major*, 33 F.4th 370, 382 (7th Cir. 2022) (holding that even if a defendant was trying to urge a co-defendant to "tell the truth" from his point of view "such conduct may still constitute obstruction of justice if its purpose is to persuade a witness or co-defendant to alter her testimony").

Finally, it is well-established that attempting to threaten a prosecutor warrants such an enhancement.  *See, e.g.*, *United States v. Addison*, 683 F. App'x 921, 923 (11th Cir. 2017) (threatening letter); *United States v. Black*, 168 F. App'x 272, 275–76 (10th Cir. 2006) (applying enhancement regardless of whether threat was credible because "to just have people threatened

like that does have an impact on individuals . . . and hence the administration of justice"); *United States v. Hopson*, 189 F. App'x 426, 428–30 (6th Cir. 2006) (telling prosecutor during hearing defendant was "going to get [him] when he gets out").

Here, Okuo's messages to Musau warrant an enhancement under Section 3C1.1 for several independent reasons.  First, he attempted to persuade Musau to give false information to investigators; for example, to tell them that Okuo was not the source of her fake passports.  PSR ¶ 110; *see Monell*, 801 F.3d at 51.  Second, he attempted to convince Musau not to cooperate with law enforcement.  PSR ¶ 111; *see Voccola*, 99 F.3d at 45–46.  Third, he told Musau that he would "show [the prosecutor] he can be touched that his family can be touched . . . you just remain silent I am show dem I am not a victim de will be da victim," an apparent threat.  PSR ¶ 112; *see, e.g.*, *Black*, 168 F. App'x at 275–76.

### C.   <u>Acceptance of Responsibility</u>

Consistent with the defendant's plea agreement, the government submits that a 3-level reduction for acceptance of responsibility under Section 3E1.1 is warranted.  PSR ¶ 3; Dkt. 104 (plea agreement).  Probation has concluded that Okuo does not deserve credit for acceptance of responsibility based on the enhancement for obstruction of justice and Application Note 4 to U.S.S.G. § 3E1.1.  The government understands Probation's position, which is not unreasonable, but respectfully submits under the unique circumstances of this case, a reduction for acceptance of responsibility is warranted.

Application Note 4 to Section 3E1.1 provides that where a defendant commits conduct resulting in an enhancement for obstruction of justice under Section 3C1.1, such obstruction "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct," but there "may be extraordinary cases in which adjustments under both Sections 3C1.1 and 3E1.1

11

may apply."   To be sure, the First Circuit has typically affirmed sentences declining to credit acceptance of responsibility where the defendant received an enhancement for obstruction.  *See, e.g.*, *United States v. Herrara-Sarita*, 181 F.3d 81 (1st Cir. 1999) (explaining that an "adjustment for acceptance of responsibility rarely will be appropriate where, as here, a defendant's BOL has been enhanced for obstruction"); *United States v. Kennedy*, 974 F.2d 1329 (1st Cir. 1992) (same); *see also United States v. Stile*, 845 F.3d 425, 431–32 (1st Cir. 2017).

Nevertheless, as the First Circuit has also noted, whether a defendant who warrants an enhancement for obstruction of justice is entitled to credit for acceptance of responsibility is a "fact-dominated inquiry," and the Court's review of the issue is afforded deferential review.  *See Herrara-Sarita*, 181 F.3d at 81.  And while there appears to be no all-encompassing First Circuit case discussing under what particular circumstances both Sections 3C1.1 and 3E1.1 can apply and what factors should be considered in whether the case is "extraordinary," out-of-circuit caselaw has squarely held that "[c]ases in which obstruction is not inconsistent with an acceptance of responsibility arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice." *United States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003); *United States v. Hopper*, 27 F.3d 378, 383 (9th Cir. 1994) ("[A]s long as the defendant's acceptance of responsibility is not contradicted by an ongoing attempt to obstruct justice, the case is an extraordinary case within the meaning of Application Note 4 and simultaneous adjustments under Sections 3C1.1 and 3E1.1 are permissible."); *United States v. Booth*, 996 F.2d 1395, 1396–97 (2d Cir. 1993) (credit for acceptance warranted where defendant told victim not to cooperate with FBI and later confessed).

Here, Okuo's last obstructionist conduct was in June 2021, before he was even indicted, and 18 months before he pleaded guilty.  The government also notes that the defendant has had

numerous *ex parte* counsel-related hearings before Chief Magistrate Judge Kelley and experienced several withdrawals of counsel; but less than four months after his present counsel was appointed, the defendant accepted responsibility and pleaded guilty.  Thus, this case is consistent with a defendant who "initially attempt[s] to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice."  *Gregory*, 315 F.3d at 640.

## III.   <u>SENTENCING RECOMMENDATION</u>

The government recommends a sentence of 57 months in prison, 36 months of supervised release, restitution of $1,091,386.71, a mandatory special assessment of $100, and no additional fine or forfeiture[4] in light of his restitution obligations.   The government submits that its recommendation—an approximate 10 percent downward variance below the applicable GSR of 63 to 78 months as calculated by the government—is warranted to account for (i) potential additional time in immigration custody if the defendant is deported, (ii) the fact that the defendant was detained pre-trial during COVID-19, and (iii) his mother's ill health.  *See* PSR ¶ 153.  A 57-month sentence is reasonable, is not greater than necessary to promote the Section 3553(a) factors, and ensures consistency in sentences for similarly situated defendants.

### A.   <u>Comparable Sentences</u>

A sentence of 57 months is consistent with recent sentences imposed on other defendants in this District convicted of similar offenses, and will prevent unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6).

Florence Musau, Okuo's principal co-conspirator, was sentenced to 44 months in prison by Judge Burroughs two months ago.  *United States v. Musau*, 21-cr-10190-ADB, Dkt. 150.

---

[4] The government previously administratively forfeited $102,637 in cash that was seized from the apartment of Okuo and Musau during their arrest.  *See* Dkt. 105.

Although the transcript of Musau's sentencing hearing remains under seal, the government can represent to the Court that Judge Burroughs stated on the record that a higher sentence would have been imposed if not for the government's reasonable recommendation of 44 months.   The government's recommendation marked an approximate 15 percent variance below Musau's applicable GSR of 51 to 63 months.  *See id.* at Dkt. 146 (government sentencing memo).

In any measurable sense, Okuo is meaningfully more culpable than Musau.  *See* PSR ¶¶ 11–14.  Further, while Okuo obstructed justice, Musau attempted to do the opposite.  *Id.* at ¶ 111.  Finally, while Okuo's background and upbringing does not warrant a variance, Musau was raised by a single parent in a poor town in Kenya without running water, and other events of her childhood warranted consideration (which the government can address under seal, if necessary).

In *United States v. Iyalekhue*, 20-cr-10208-RWZ, the defendant pleaded guilty to an information charging one count of conspiracy to commit mail and wire fraud and one count of money laundering in connection with his role in a similar romance scam.  Indeed, the scam was so similar that Okuo sent Musau a news story to warn her about the federal charges against Iyalekhue. The nature and scope of the fraud was similar: Iyalekhue opened 10 fraudulent accounts, and the applicable loss amount was $813,000.  Judge Zobel sentenced Iyalekhue (who had a criminal history) to 63 months in prison.

In *United States v. Osemwegie*, 21-cr-10219-DJC, the defendant pleaded guilty to a one count information charging him with conspiracy to commit bank and wire fraud.  As part of his role in romance scams, Osemwegie used four aliases, and his conduct involved an intended loss of approximately $686,000.  Judge Casper sentenced him to 32 months in prison.  Osemwegie's history and characteristics, including his level of contrition and acceptance of responsibility, however, stand in contrast to Okuo.  Osemwegie was a naturalized United States citizen, had a 10-

year track record of stable employment in the United States prior to his arrest, remained employed while on pre-trial release, had two young children in the United States, and told the Court, among other things, at sentencing: "I feel completely ashamed and embarrassed. I take full responsibility for my actions and und understand that these individuals [the victims] . . . deserve not to have been exploited. . . . I'm aware that my disgusting act has affected those around me. . . . I understand that for my actions, there are always consequences. I know that I deserve to be punished for my involvement and I also believe in the fairness of this court."

In *United States v. Osei*, 21-cr-10064-IT, the defendant pleaded guilty to an indictment charging him with wire fraud and money laundering, among other offenses. To be sure, Osei opened more accounts (77) and accepted more money ($4.2 million) than Okuo, although they participated in the schemes for a similar amount of time. Unlike Okuo, however, Osei did not obstruct justice. Further, in stark contrast to Okuo, Osei was raised by a single parent in abject poverty in a slum in Ghana, lived in a 100-square foot apartment without running water, and had a limited education. Further, Osei and his family faced significant collateral consequences, as he had two children in the U.S. whom he potentially would never see again upon his deportation to Ghana. Taking those extraordinary Section 3553(a) factors and collateral consequences into account, Judge Talwani sentenced Osei to 54 months in prison, an approximate 35 percent variance below his applicable GSR of 87 to 108 months.

In *United States v. Balogun*, 19-cr-10230-DPW, the defendant pleaded guilty to an indictment charging him with one count of money laundering conspiracy arising from similar romance scam and business e-mail compromise schemes. Notably, Balogun was less culpable than Okuo: he opened one fraudulent account, and the intended loss was approximately $550,000. Judge Woodlock sentenced Balogun to 42 months in prison.

These sentences and the applicable GSR, in comparison to Okuo's GSR, are set forth in the table below:

| Case | Docket No. | GSR | Sentence |
|------|-----------|-----|----------|
| *United States v. Iyalekhue* | 20-cr-10208-RWZ | 63–78 months | 63 months |
| *United States v. Okuo* | 21-cr-10309-LTS | 63–78 months | [*57 months rec.*] |
| *United States v. Osei* | 21-cr-10064-IT | 87–108 months | 54 months |
| *United States v. Musau* | 21-cr-10190-ADB | 51–63 months | 44 months |
| *United States v. Balogun* | 19-cr-10230-DPW | 46–57 months | 42 months |
| *United States v. Osemwegie* | 21-cr-10219-DJC | 46–57 months | 32 months |

A 57-month sentence is also consistent with comparable cases nationwide. According to JSIN, during the last five fiscal years (FY2017-2021), there were 245 defendants, like Okuo, whose primary guideline was §2B1.1, with a Total Offense Level of 26 and a Criminal History Category of I. The median length of imprisonment imposed was 53 months.

**B.      Other Section 3553(a) Factors**

A 57-month sentence promotes the interests of sentencing and is consistent with the remaining Section 3553(a) factors.

**1.      The Nature and Circumstances of the Offense
and the History and Characteristics of the Defendant**

Okuo's crime was serious, caused significant harm to real victims, and is not mitigated by his history and characteristics. *See* 18 U.S.C. § 3553(a)(1). Okuo and his co-conspirators capitalized on dozens of lonely victims' desire to find companions, using promises of love to persuade them to wire large sums of money into accounts that Okuo and his co-conspirators opened using counterfeit passports. To be sure, Okuo did not interact directly with victims, but that was

not his role in the scheme, nor is that role different than the role played by every other money-side co-conspirator who has been sentenced to a meaningful term of incarceration.  Indeed, as set forth above, there are several aggravating factors that make Okuo's conduct more culpable than many similar defendants.  He referred to the scheme's victims as "mugu" or fools.  He sent his co-conspirator a news article about a federal prosecution of Iyalekhue as a warning.  His conduct grew increasingly sophisticated over time.  He engaged with others (*e.g.*, the Omoruyis) in the fraud, and he recruited Musau to the scheme, teaching her every step of the criminal process, providing her with fake passports, and reaping a cut of her fraudulent proceeds.  He began participating in the scheme shortly after arriving in the U.S., engaged in criminal conduct for four full years, and was stopped only by his arrest.  And of course, distinguishing him from every other romance scam defendant discussed above, Okuo obstructed justice—several times over.

Unlike other romance scam defendants, Okuo's history and characteristics do not mitigate, much less excuse, his conduct; if anything, they make it more reprehensible.  Unlike defendants like Musau or Osei, Okuo enjoyed a relatively stable childhood, was well-educated, had a good job in Nigeria, and had absolutely no reason to commit his crimes.  Okuo did not need to steal money to provide for himself or his family, nor did he resort to criminal conduct to feed an addiction; he did it out of greed and because he thought he could get away with it.  It is also notable that during a global pandemic, Okuo accepted fraudulent pandemic-unemployment relief proceeds.  Finally, deportation to Nigeria—if he is deported[5]—is not nearly as significant of a collateral consequence as it is for other defendants like Osei.  If deported, Okuo will return to the country where he has spent his entire life, where he was sending much of his fraud proceeds before

_____

[5] According to ICE, deportations in 2021 and 2022, including deportations to Nigeria, were at record lows.  Accordingly, it is not certain that Okuo, a non-violent offender, will be deported following the completion of his sentence.

he was caught, where his two parents and five siblings all live, and where he will be effectively released from his restitution obligations.

### 2. The Need for the Sentence Imposed to Promote Respect for the Law and to Provide Just Punishment

Okuo has shown as much respect for the law as he did the scheme's victims: none. *See* 18 U.S.C. § 3553(a)(2)(A). He understood that the scheme targeted "mugu," he knew he had to cover his tracks with fake passports and structured withdrawals, he knew that others committing the exact offense had been charged with federal crimes, and he chose to thumb his nose at the law and the victims he had defrauded. Then, when he got caught, Okuo tried to get a potential cooperating witness to lie, then convinced her not to cooperate altogether, and then threatened a prosecutor. It is also telling that in messages with Musau, Okuo appears to have minimized the seriousness of his conduct and complained that this should not be treated like a "murder case."

### 3. The Need to Afford Adequate Deterrence to Criminal Conduct

General deterrence is particularly important here. *See* 18 U.S.C. § 3553(a)(2)(B). In June 2020, Okuo literally sent Musau a news article about federal charges against Iyalekhue for participating in the same type of scheme, in the same geographic area, in the same time period. But rather than stop his fraudulent conduct, Okuo continued it, and he even became more sophisticated by using less detectable and traceable reloadable debit cards to execute the scheme.

Unfortunately, online scams taking advantage of lonely and elderly victims are increasingly rampant[6] because they are relatively easy to complete, and the large amounts of

---

[6] *See, e.g.*, Federal Trade Commission, "Romance scams take record dollars in 2020," Feb. 10, 2021, *available at* https://www.ftc.gov/news-events/blogs/data-spotlight/2021/02/romance-scams-take-record-dollars-2020 (reported losses reached $304 million, up 50% from 2019); Federal Trade Commission, "New FTC Data Show Consumers Reported Losing More Than $200 Million to Romance Scams in 2019," Feb. 12, 2020, *available at* https://www.ftc.gov/news-

money available attract those willing to risk a few years in prison.  Further, nearly all victim-side co-conspirators are located in countries where the risk of capture and extradition is low.  However, these schemes rely on participants in the United States, like Okuo, to open fraudulent bank accounts and purchase reloadable debit cards that provide a venire of legitimacy to victims who would otherwise balk at sending money directly to countries like Nigeria.  If there is a meaningful chance to reduce the hundreds of millions of dollars in losses to romance scam victims annually, Okuo's sentence should reflect the need to deter the many others who might be—and year after year, are—willing to engage in the same misconduct.

The need for specific deterrence and to protect the public are factors here as well, 18 U.S.C. § 3553(a)(2)(C), particularly with a defendant who knew that the scheme was targeting "mugu," understood that what he was doing was wrong, was aware that others were being prosecuted for the same conduct, and nevertheless made the wrong choices over and over again.  Okuo may never have the opportunity to commit a crime in this country again, but he will in Nigeria.  He should be deterred not only by the risk of getting caught and the punishment that follows if that risk becomes reality, but also through developing a greater understanding during his sentencing of how his actions and those of his co-conspirators harm real, innocent people.

### C.   Principles of Restorative Justice and Victim-Centric Approach to Sentencing in Romance Scam Cases

There is no dispute between the parties that this is not the case or the defendant for restorative justice: the victims have not shown an interest in it, the defendant has not shown an interest in it while detained at Wyatt, and there are many other practical obstacles to it in this case.

---

events/press-releases/2020/02/new-ftc-data-show-consumers-reported-losing-more-200-million (reported losses reached $201 million, up 40% from 2018).

But the undersigned respectfully submits that restorative justice should be considered in similar cases, not only because it may be the best method to repair the harm done by offending behavior,[7] but also because it may potentially reduce the prevalence of online scams generally.  In considering the principles of restorative justice for Okuo's sentencing, the government has sought to highlight the unique harms suffered by victims of romance fraud in general, the harms suffered by victims of this scheme specifically, and Okuo's demonstrated lack of appreciation of these harms to date.

From the standpoint of victims, scholarship explains that there are often no major differences between the psychological consequences of offline and online crimes.[8]  Researchers have noted that romance fraud, in particular, can instigate unique harm due to its potential to cause a "double hit" as victims suffer both the loss of money as well as the sudden loss of a significant romantic relationship,[9] since perpetrators "use the facade of the romantic relationship to cultivate trust and rapport with victims, allowing them to manipulate their targets into sending money."[10]  In addition to the financial effects of the fraud, studies of romance fraud reveal that victims suffer myriad negative emotions, including "depression, shame, embarrassment, shock, anger, guilt, worry/stress, and fear."[11]  Another study found evidence of eight of the nine types of abuse

---

[7] *See, e.g.,* Paul McCold and Ted Wachtel, Restorative Justice Theory Validation, in Restorative Justice: Theoretical Foundations 110, 111 (Weitekamp & Kerner eds., 2002).

[8] *See* Teresa Lancry, A.S. Robalo, and Razwana Begum Bt Abdul Rahim, *Cyber Victimization, Restorative Justice, and Victim-Offender Panels*, 18 ASIAN J. CRIM. 61, 64 (2023).

[9] Monica T. Whitty and Tom Buchanan, *The Online Dating Romance Scam: The Psychological Impact on Victims – both Financial and Non-financial*, 16 CRIMINOLOGY & CRIM. JUSTICE, 176-194, 180 (2016).

[10] Cassandra Cross, Molly Dragiewicz, and Kelly Richards, *Understanding Romance Fraud: Insights from Domestic Violence Research*, 58 BRIT. J. CRIMINOLOGY 1303, 1304 (2018).

[11] Whitty and Buchanan, *supra*, at 189.

prominent in domestic violence cases in romance fraud cases, with victims reporting "economic abuse, isolation, monopolization, degradation, psychological destabilization, emotional or interpersonal withdrawal, and contingent expressions of love."[12]  And despite these harms, shame and fear of judgement can deter victims from reporting the crime or seeking help.[13]

The government will not repeat the victims' stories again here, *see supra* Part I.B., other than to note that the reports of Okuo's victims here echo this scholarship.  The government hopes that Okuo and defendants like him grasp that impact, but to date, his actions have not demonstrated concern for the harms that his actions, and the larger scheme, have caused victims.  In fact, Okuo has callously demeaned and insulted his victims as "mugu" or "fools," and instead complained of his own circumstances in various letters to the Court.

## IV.   **CONCLUSION**

A sentence that does not include a meaningful term of incarceration in addition to time that Okuo has already served is not sufficient, nor is a sentence that approaches the 44 months imposed on Musau, Okuo's less culpable co-conspirator.  Regardless of how the Court calculates the applicable GSR, a 57-month sentence is an exceedingly reasonable, measured recommendation, and it is a fair and just sentence that is sufficient but not greater than necessary.

For the foregoing reasons, the government respectfully recommends a sentence of 57 months in prison; 36 months of supervised release; no fine based on the defendant's restitution obligations; a $100 mandatory special assessment; restitution due and payable immediately as set forth in the PSR; and no additional forfeiture.

---

[12] Cross, Dragiewicz, & Richards, *supra*, at 1317.

[13] Whitty and Buchanan, *supra*, at 181.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By:     */s/ Ian J. Stearns*
      IAN J. STEARNS
      Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

By:     */s/ Ian J. Stearns*
      IAN J. STEARNS
      Assistant United States Attorney