UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>MARK OKUO )<br>        Defendant. )| Cr. No. No. 21-cr-10309-LTS |

**SENTENCING MEMORANDUM**

Mark Okuo allowed his own exhaustion and desire for financial security to overpower his empathy for others.  He has been reckoning with how this happened, and has, over time, developed meaningful insights into how he allowed this to occur. He understands that he must be held accountable, and to continue to search his own conscience for deeper understanding of how he became someone that hurt others and "brought his family shame."

He has always been a man who worked. He came from a family of limited means and education and worked to further his educations – having earned multiple degrees – including a degree in accounting, and then a degree in social work in Nigeria. In Nigeria he worked in real estate, building and selling houses. When he came to the United States, despite his advanced degrees, he could only find work on the margins of the economy, and worked as cashier, as a personal care assistant and as a janitor. He typically earned no more than 10 dollars an hour, except for a brief stint when he was working for 17 dollars an hour cleaning houses and offices. Often, to make ends meet he would work several jobs at once – working

as a personal care attendant during the day, and cleaning office buildings most of the night. Time for rest was scarce – he would often only sleep a few hours a night. When he got involved in this scheme he was exhausted – physically, emotionally, and morally. When offered the opportunity to deposit and take money out of banks for a percentage of each transaction, he saw the potential for something he hadn't had in some time – rest. None of this diminishes the wrongfulness of his conduct in this case. He now describes his decision as "weak" and has accepted responsibility for his role in a much larger transnational network. Whether his decision was weak or not – it was harmful, and he must be held accountable for that harm. The question is what sentence will meaningfully do so.

After consideration of the advisory United States Sentencing Guidelines and the applicable factors contained in 18 U.S.C. § 3553(a), Mr. Okuo requests that this Court impose a sentence of **46 months to be followed by one year of supervised release**. This sentence is appropriately severe, consistent with sentences given to others with similar backgrounds and similar offenses, and meaningfully achieves the statutory purposes of punishment.

## ARGUMENT

Mr. Okuo requests that this Court impose a sentence of no more than 46 months**.** This recommendation considers, without wholly adopting, the framework provided by the United States Sentencing Guidelines and is sufficient to promote respect for the law and serve the purposes of punishment, rehabilitation and deterrence, pursuant to 18 U.S.C. §3553, while recognizing the unique circumstances of this case.

2

## I.   Mr. Okuo's History and Characteristics and the Nature and Circumstances of the Offense

Mr. Okuo grew up lower-middle class as part of a large family in Benin, Nigeria. See PSR at ¶150. His parents have limited education, but he worked hard to find the means and the opportunity to advance his education, earning a polytechnical degree in accounting, and then, a bachelor's degree in social work. Id at ¶170. After college he obtained employment working in real estate, as a supervisor for a company that builds houses. Id. at ¶171-178. He had a son, who is now 8, with whom he stays in regular contact. Id. at 160. When he came to the United States he came on a visitor's visa, and planned to just have a short visit, but after being here for a while, hoped to stay. He found that in order to be here he would need to accept work wherever he could find it and he began working as a cashier. Id. He then used his training and skills in social work to obtain a position as a personal care attendant. But at 10 dollars an hour, one job was not enough. During some years, he worked two jobs – usually starting at 7 or 8 in the morning – working until 4 p.m., and then going to his other job from early evening until after midnight. When counsel asked him how he did it, and when he slept, he sighed, "I am really not sure how I did it, I was very, very tired." Against this backdrop he was approached through social media by the operators of various fraud schemes. He was courted, in summary, to open accounts in fake names, deposit money from fraud schemes, and take money out. He was told he could keep a percentage for himself. The temptation of making more money in just hours than he could make in weeks overpowered his historically intact moral compass, and he succumbed. He

eventually found himself embroiled in this relatively straight forward way of making money. He later began engaging in this scheme with his girlfriend, Florence Musau. Encouraging her involvement is something he both acknowledges and regrets. While he knew the money was from various forms of fraud, including so called "romance scam" he never corresponded with or cultivated relationships with the victims.

The proliferation of large networks of international fraud is a real and unfortunate part of transnational networks of exchange in the internet era. In the last several years, enterprising outlaw networks from less affluent countries have targeted victims from more affluent ones. Over the last several years, engaging in internet fraud has become a fairly common practice in Nigerian communities as a means of making money quickly in a country with marginal economic mobility.[1] The victims are often people – wherever they are – with particular limitations (e.g. age, loneliness, lack of internet sophistication) who have access to money that is limited by United States standards, but relative to the means of the average person in Nigeria significant. Those who *run* the scams have gotten rich. People like Mr. Okuo, the money mules, are often people who were living on the fringes of the economy – and allow themselves to fall prey to the promise of money they would otherwise have to work long hours over many years to earn. Again, this is not to excuse, but rather help to explain the conduct for which he has pled guilty and for which he has been and will continue to be held accountable.

---

[1] https://guardian.ng/saturday-magazine/prevalence-of-internet-fraud-among-nigerian-youths/.

## II.    The Applicable Sentencing Guidelines

Mr. Okuo and the Government agree that the Total Offense Level should be 26 and the Guideline range should be 63 to 78 months. The Government has agreed in a plea agreement dated January 6, 2023, to recommend a sentence of no more than 57 months.[2]

### a.  A three-point reduction for acceptance of responsibility is appropriate.

This Court should apply a 3-point reduction for acceptance of responsibility, as the parties agreed in the Plea Agreement, and as the Government and Defendant continue to agree. The conduct detailed in the PSR that amounts to obstruction of justice occurred during the early period of his incarceration, during a time of tremendous emotional turmoil, and prior to a point where he was represented by counsel with whom he had formed a rapport. Once Mr. Okuo developed a relationship of trust with his counsel, he quickly grasped the posture of his case and took steps to change his plea and accept responsibility. While accepting that the Sentencing Commission, in commentary, counsels against finding acceptance where obstruction has occurred, the Guidelines and caselaw nevertheless make clear that this Court is afforded discretion to find that Mr. Okuo's overall circumstances merit the application of both 3C1.1 and 3E1.1, an outcome which both the defendant and the Government agree is appropriate in this case.[3]

---

[2] While Mr. Okuo's plea agreement preserves his right to challenge an obstruction enhancement, he acknowledges that there is sufficient evidence to establish the enhancement. However, it is important to him to state that he that he did not intend to threaten the prosecutor.

[3] As noted below, Probation made a similar recommendation concerning Mr. Okuo's co-defendant. The Government similarly recommended that she receive credit, and the Court did apply the three-point reduction.

Application Note 4 of USSG provides that "[c]onduct resulting in an enhancement [for obstruction of justice] ordinarily indicates that the defendant has not accepted responsibility." USSG § 3E1.1, comment. (n.4). In the case of a defendant who has obstructed or impeded the administration of justice, a "natural tension arises between these two guidelines when a defendant obstructs justice yet professes to accept responsibility. In such cases, the defendant faces an uphill, but not necessarily an impossible, climb." *United States v. Talladino*, 38 F.3d 1255, 1263 (1st Cir. 1994). The Sentencing Guidelines explicitly confirm that this tension can be reconciled and adjustments for both obstruction of justice and acceptance of responsibility can coexist, albeit in "extraordinary cases". *Id.* In such instances, the defendant has the burden of proving that an adjustment for acceptance of responsibility is warranted. *See United States v. Gonzales,* 12 F.3d 298, 300 (1st Cir. 1993). The Guidelines do not attempt to define "extraordinary" circumstances – and cases suggest that they tend to be a rather mobile goalpost in practice – but it is clear that the sentencing court is granted wide discretion in balancing these considerations, *United States v. Maguire*, 752 F.3d 1, 6–7 (1st Cir. 2014), and whether a defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility is "a fact-dominated issue, and [a sentencing court's decision] will not be overturned unless clearly erroneous." *United States v. Royer,* 895 F.2d 28, 29 (1st Cir.1990)

Even applying the obstruction of justice enhancement, as this Court is likely to do, this is a case where the acceptance of responsibility adjustment should be

applied as well. In *United States v. Teyer,* 322 F.Supp.2d 359, 368 (S.D.N.Y. 2004), the court noted that:

> The Sentencing Commission adopted the adjustment for acceptance of responsibility to create an incentive for defendants to plead guilty, admit their crimes, and thereby save both the Government's and the Court's resources in preparing for and conducting trial. Were courts to hold that any obstructive conduct, however early in the investigation or prosecution of the case and whatever its relationship to the charges ultimately brought, forever disentitled a defendant to credit for later acceptance of responsibility, this incentive would be ill served.

Thus, cases in which obstruction is not inconsistent with an acceptance of responsibility "arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice." *United States v. Hopper,* 27 F.3d 378, 383 (9th Cir. 1994). "[A]s long as the defendant's acceptance of responsibility is not contradicted by an ongoing attempt to obstruct justice, the case is an extraordinary case within the meaning of Application Note 4 and simultaneous adjustments under §§3C1.1 and 3E1.1 are permissible." *Id.* The touchstone, the *Hopper* Court found, was whether the defendant's obstructive conduct was inconsistent with, or otherwise devalued the acceptance of responsibility in a way that rendered it obviously non-genuine. *Id.* For example, where a defendant had suborned perjury in a "purposeful and methodical way" and later offered an expression of remorse the court found notable for its "insincerity", the reduction was justifiably withheld. *Id.*, citing *United States v. Lato,* 934 F.2d 1080 (9th Cir. 1990). Similarly, in *United States v. Acuna,* 9 F.3d 1442, 1446 (9th Cir.1993), The *Hopper* court noted that the defendant was correctly denied a reduction because, after pleading guilty, he went on to testify falsely on

behalf of his coconspirators a decision inconsistent enough with acceptance of responsibility to "foreclos[e] the possibility that the case was an extraordinary case." *Hopper*, 27 F.3d at 383. Applying its holdings to the facts in the case before it, the *Hopper* court affirmed that the defendant's conduct properly amounted to obstruction, but also affirmed the sentencing judge's application of a two-point reduction for acceptance, explaining that "Hopper's obstructive conduct of burning evidence and attempting to procure false alibis is not inconsistent with his subsequent confession of guilt and disclosure of information relating to the crime. Hopper's obstructive conduct occurred soon after he discovered his father had been arrested, and although the conduct persisted for a few days, it was not a methodical, continued effort to obstruct justice." *Id.* at 383-84. Further, the court found that "Hopper did not feign acceptance of responsibility while continuing obstructive conduct in an attempt to hinder the Government's investigation." *Id.* at 384.

In a similar vein, the Tenth Circuit has advised that in determining whether a case is extraordinary, the sentencing court must "consider the totality of the circumstances, including, but not limited to: 1) whether the obstruction of justice was an isolated incident or an on-going, systematic effort to obstruct the prosecution, and 2) whether defendant voluntarily terminated his obstructive conduct and truthfully admitted the conduct comprising the offense of conviction." *United States v. Salazar-Samaniega,* 361 F.3d 1271, 1280 (10th Cir. 2000).

The First Circuit has not explicitly adopted the Ninth Circuit's "inconsistency" test, but a review of its decisions on this issue suggests that the Court applies some variant of it, typically affirming sentencing courts which found a

lack of "extraordinary" circumstances where the defendants, more often than not, undermined their own acceptance with further misconduct. For example, in *United States v. Hardy*, the appeals court affirmed denial where the defendant's guilty plea came only after an initial trial and conviction, a successful appeal, and a subsequent re-prosecution which culminated in a change of plea only after the defendant had vacated state-level predicate offenses that exposed him to increased sentencing liability. The appeals court noted that, early on in the proceedings, Hardy lied to the police and to a magistrate judge regarding his lack of prior association with his co-defendants and gave a false home address which was never recanted. *United States v. Hardy*, 99 F.3d 1242, 1246 (1st Cir. 1996). Moreover, while allowing that Hardy may have been within his rights to pursue a strategy that minimized his eventual sentencing liability, the Court found that it was "especially appropriate for the district court to consider the timeliness of the defendant's conduct in manifesting ... acceptance of responsibility" given "the prolonged procedural travel of this case, during which Hardy never uttered a word remotely resembling remorse." *Id*. at 1247. Overall, the *Hardy* court found that the sentencing court had "assiduously searched the record and observed Hardy's in-court demeanor for any indication that he was truly remorseful. Instead, it found only his unelucidated guilty plea, with no mention of remorse, and an extensive record of persisting criminal conduct "inconsistent" with genuine remorse." *Id*. at 1248.

In *United States v. Tracy,* 989 F.2d 1279 (1st Cir. 1993), the Court affirmed the denial of a reduction to a defendant that the sentencing court had found "opportunistic", prepared to "say anything to minimize his sentence", and who had

delayed his trial a number of times, failed to appear on his trial date and, when eventually run to ground by law enforcement in Florida, was carrying false identification and held himself out as another person. *United States v. Tracy,* 989 F.2d 1279, 1282, 77-88 (1st Cir. 1993).

The First Circuit was similarly underwhelmed by the defendant's argument that credit for acceptance was improperly denied where the "defendant's falsehoods not only qualified for an enhancement for obstruction of justice under § 3C1.1, but also indicated that he had not accepted responsibility under § 3E1.1" – perhaps most tellingly illustrated by the fact that the defendant had employed a false identity that was only "uncovered during the pre-sentence investigation". *United States v. Figueroa*, 201 F.3d 429 (1st Cir. 1999) (Unpublished decision); *also see United States v. Herrara-Sarita*, 181 F.3d 81 (1st Cir. 1999) ("In and of itself, the dogged persistence with which the two appellants maintained their false identities for months on end bears ample witness to the soundness of this determination.")

By contrast, Mr. Okuo's obstructive conduct came close on the heels of his arrest, pre-dated his change of plea, did not represent a persistent course of conduct, and was not inconsistent with his subsequent acceptance of responsibility. Mr. Okuo was arrested on March 25, 2021. PSR at ¶1. The conduct at issue all occurred within three months of his arrest date, during a very overwhelming time for Mr. Okuo. PSR at ¶112. Thereafter, things took a decisively different turn, with Mr. Okuo electing to accept responsibility soon after he had counsel with whom he connected.

Mr. Okuo's recent decision to change his plea should also not be held against him as having come too late in the proceedings. It is accurate that 18 months elapsed between Mr. Okuo's arrest and his moving for a Rule 11 hearing[4], but Mr. Okuo's docket amply suggests that the reason had more to do with untenable relationships with prior counsel and a protracted delay in Okuo receiving a copy of the discovery in his case. In August of 2022, current counsel was appointed to represent Mr. Okuo; counsel prioritized building a rapport with Mr. Okuo and helping him to understand the posture of his case. Within four months, Mr. Okuo had a clear-eyed appreciation of his situation, had reached a plea agreement with the Government, and requested a change of plea as soon as possible. Since that point, he has asked counsel to move with all due speed on sentencing.

Notably, the Government – the party who would have the most reason to press for denial if Mr. Okuo's obstruction had caused real inconvenience (and the most reason to take issue with Okuo's alleged June 2021 conduct), is nevertheless not contesting that he should receive credit for acceptance of responsibility. And the Government, it should be noted, displayed a similar degree of equanimity on this issue when it came to Okuo's co-defendant, Ms. Musau. This was despite the fact that Ms. Musau moved to withdraw her guilty plea, making false or misleading statements in the process, and engaged in other behavior that could be seen as dilatory before changing her plea. In its sentencing memo for Ms. Musau, the Government expressly described her conduct as "contin[uing] to exhibit a lack of

---

[4] The motion for a R. 11 hearing was filed on December 15th, 2022, and the hearing itself occurred – without excessive delay or vacillation by the Defendant – on January 27th, 2023.

respect for the law and this Court, blaming numerous lawyers appointed (and retained) to represent her and making several false statements in letters and other filings." *United States v. Musau*, 21-CR-10190-ADB doc. 146 (Gov't Sent. Mem.) at 13. While Probation also recommended withholding credit for acceptance in Ms. Musau's case, the government – conceding that precedent supported Probation's position – nevertheless made clear that it wished to stand by the terms of its plea agreement with Ms. Musau and urged the court to apply the three-point reduction. Id. at 8. And, Judge Burroughs did, in fact, allow the reduction at sentencing.

In light of what Mr. Okuo has lost in the period since his arrest, weighed against his early and limited obstruction, acceptance credit should be awarded.

## III.   Loss Amount is Poor Measure of Culpability [5]

In this case, U.S.S.G. § 2B1.1 provides for a 14-level increase to the offense level based on economic loss.[6] While this is the proper loss amount, it does not consider Mr. Okuo's motivations for engaging in the scheme, or any of his individual characteristics. A sentencing process driven largely by a finding of loss, as in this case and in most fraud cases, ignores many important elements of Section 3553(a). See *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (noting that "the Sentencing Guidelines for white-collar crimes [can produce] a black stain on common sense"); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y 2006),

---

[5] This section is largely adapted, with permission, from a Sentencing Memorandum filed by AFPD Jane Peachy in *United States v. Iwuanyanwu*, 19-CR-10119-DJC (Document # 204 Def. Sent Memo at 16-21) and AFPD Forest O'Neil-Greenberg in *United States v. Osei*, 1:21-CR-10064-IT (Document #91, Def. Sent Memo at 11-16.)

[6] The parties agreed regarding this loss amount and corresponding increase above the base offense level.

*aff'd 301* Fed. Appx. 93 (2d Cir. 2008) (lamenting "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense).

Indeed, Courts have often recognized that the financial guideline is crude and frequently ill-fitting. As Judge Rakoff poignantly observed in *United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012):

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

Judge Rakoff observed in an earlier decision, "[a]s many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *Adelson,* 441 F.Supp.2d at 510, *citing generally* Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998). In *Adelson,* Judge Rakoff ultimately imposed a sentence of three and one-half years, notwithstanding an advisory guideline range of life imprisonment. The Court called the Guidelines "wildly off-base," *id.* at 515, and called attention to "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract

arithmetic, as well as the harm that guideline calculations can visit on human beings *if **not cabined by common sense.**" Id.* at 512 (emphasis added); *see also United States v. Musgrave,* 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances.").

Judge Rakoff observed that the "vast increase in white collar sentencing was partly mandated by Congress, reacting in turn to public outcry over such massive frauds as Enron and WorldCom," and noted that "in implementing the Congressional mandate, the Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense." *Id*.

In a concurring opinion in *United States v. Corsey,* 723 F.3d 366, 379-80 (2d Cir. 2013), Judge Underhill echoed these same observations:

> The Sentencing Commission set the original 1987 Guidelines for economic offenses higher than historical sentences in order to further the deterrence and just punishment goals of sentencing. In 1989, in response to the savings and loan crisis, Congress passed legislation increasing the maximum penalties for financial fraud offenses and directing the Sentencing Commission to include specific offense characteristic enhancements in the fraud guideline ... In 2001, the Sentencing Commission amended the Guidelines to combine the fraud, theft and embezzlement, and property destruction guidelines into a single guideline, section 2B 1.1. That change was accompanied by the publication of a new loss table that had the effect of increasing offense level calculations, especially for high-dollar value crimes... Most recently, the fraud guideline was amended in 2003 in response to Congressional directives in the Sarbanes-Oxley Act. Those amendments included further changes to the loss table that added offense level points

in the highest loss cases. The three sets of amendments to the loss table of the fraud guideline alone have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences.

*Corsey,* at 379-80 (internal citations omitted). *See also United States v. Musgrave,* 647 F. App'x 529, 538 (6th Cir. 2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, ***it is particularly appropriate for variances***.") (Emphasis added).

Scholarship has also focused on the sentences for fraud offenses and whether judges are, in actuality, strictly following Guidelines calculations in such cases. A former staff attorney to the U.S. Sentencing Commission engaged in a review of empirical data of federal sentences, observing that "[i]t appears that in practice, loss has very little correlation to the ultimate sentence imposed, regardless of how it determines the advisory guideline range." Mark H. Allenbaugh, *"Drawn from Nowhere: A Review of the US. Sentencing Commission's White Collar Sentencing Guidelines and Loss Data,"* 26 Fed. Sent'g Rep. 19, 23 (2013). Further, the author notes that "the data suggests that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases." *Id.* at 19. Ultimately, the author concludes that "judges are rightly rejecting Guideline recommendations that are driven excessively by loss" and that "the fraud Guidelines themselves are in need of a thorough revision, which should start with a reconsideration of the definition and role of loss." *Id.* "[L]oss should fundamentally be reconfigured

starting with what the Commission is most experienced with-empirical data." *Id.* at 26.

Sentencing Commission data also reflects what can only be described as broad judicial discomfort with guideline sentences in fraud cases. Sentencing Commission data for Fiscal Year 2021 shows that only 28.3% of sentences imposed in fraud cases in this district were within the guideline sentencing range.[7] U.S.S.C., *Statistical Information Packet, Fiscal Year 2021, District of Massachusetts,* at 16[8], Sentences imposed in fraud-type cases by courts in this district over the years echo these trends, and probation is a sentence other judges have imposed in the face of higher guidelines. *See, e.g., United States v. Aboagye-Marfo*, 14-CR-10050-GAO (guideline range 30-37 months, sentence of three years' probation); *United States v. Ojoko*, 14-CR-10094 (guideline range 12-18 months, sentence of three years' probation); *United States v. Isreb*, 14-CR-10063-GAO-1 (guidelines range 18-24 months, sentence of 4 years' probation); *United States v. Douglas,* No. 10-CR-10420-GAO (sentence of probation after trial on theft of Social Security benefits, where GSR was 21-27 months); *United States v. Boamah*, No. 10-CR-40028-FDS (sentence of probation in mortgage fraud with $280,000 loss); *United States v. Millet*, No. 09-CR-10195-NG (government agreed to probation sentence were defendant stole $66,532 in Social Security benefits); *United States v. Bernard*, 10-CR-10307-JLT

---

[7] Of this data, (three cases total) five percent were above the guideline range, and over 60 percent received a downward departure (excluding a downward departure pursuant to either §5K1.1 or §5K3.1). Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/ma21.pdf

[8] available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/ma21.pdf.

(sentence of probation in case where guideline sentencing range was 24 to 30 months and amount defendant embezzled from labor union was $175,312.30); *United States v. Prosperi*, No. 06-CR-10116-RGS, *aff'd,* 686 F.3d 32 (1st Cir. 2012) (after trial, varying from 87-108 month guideline sentencing range and imposing sentence of three years of probation because loss amount did not fairly reflect defendant's culpability).

Thus, it is widely recognized that the offense level called for by the sentencing guidelines in these types of cases is, more often than not, a blunt proxy for measuring the appropriate punishment. For these reasons, in this case, the guidelines should be given less weight than in other cases in fashioning a just sentence. Rather than solely tethering Mr. Okuo's sentence to the overall loss amount here, he asks this Court to consider his individual characteristics, and to vary downward from this loss-driven guideline.

## IV.   The Requested Sentence Meaningfully Considers the 18 USC §3553 Factors, And Best Furthers the Statutory Purposes of Punishment

The United States Supreme Court, recognizing the immense discretion afforded to sentencing judges, advised that sentencing courts should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The First Circuit stressed that sentencing determinations require a "more holistic inquiry" than simply plugging numbers into a guidelines' calculation, and that, the federal statutory factors are "a tapestry of factors, through which runs the thread of an

overarching principle [of parsimony]." *See United States v. Yonathan Rodriguez*, 527

F.3d 221, 228 (1st Cir. 2008), citing *Kimbrough v. United States*, 562 U.S. 85, 101

(2007). That overarching principle is to "impose a sentence sufficient but not greater

than necessary." *Id*.

In so doing, the Court must first consider the nature and circumstances of the

offense in the context of the history and characteristics of the offender. 18 U.S.C

§3553(a)(1). The Court must then consider the need for the sentence imposed (A) to

reflect the seriousness of the offense, to promote respect for the law, and to provide

just punishment for the offense; (B) to afford adequate deterrence to criminal

conduct; (C) to protect the public from further crimes of the defendant; and (D) to

provide the defendant with needed educational or vocational training, medical care,

or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2).

Put simply, these four purposes of sentencing are punishment, deterrence,

incapacitation, and rehabilitation. *See United States v. Tapia*, 564 U.S. 319 (2011)

("In determining the appropriate sentence, judges must consider retribution,

deterrence, incapacitation, and rehabilitation, §3553(a)(2), but a particular purpose

may apply differently, or not at all, depending on the kind of sentence under

consideration.)

### a. The requested sentence reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and appropriately protects the public.

The 18 U.S.C §3553(a)(1)(A) factors reflective retributive concerns.

Retribution refers to just deserts. What is just and the usefulness of the "deserts" is

unclear. While retribution may have its place, it should not be elevated above other

considerations, and to the detriment of the other three objectives. "Retribution sits uncomfortably at the intersection of two aspects of our responses to harm: our desire for people to suffer and our desire for people to change [….] But there is another option [….] the issue is not just how we show our condemnation, but how we affirm unequivocally and powerfully the importance of what was violated, without destroying the person who violated it."[9] The laws that Okuo violated are important and exist for a reason, and the harms suffered by the victims are serious. Mr. Okuo now fully recognizes that his role, even if only that of a "money mule", allowed these harms to occur. Yet it is equally important to recognize that Mr. Okuo has been and will continue to be sanctioned for this crime, and adding additional months to his sentence will do little to make the sentence a more just one. Mr. Okuo is a man with an education and an impressive work ethic. He can now use those things to do meaningful work and eventually hold his head high again as a contributing, positive member of his community in Nigeria. A just sentence will punish his criminal conduct, but should also seek to preserve, rather than squander his good traits.

To determine what is "just punishment" for Mr. Okuo under 18 U.S.C. § 3553(a), the Court must also consider how Mr. Okuo will serve his prison time and the certainty of his deportation following incarceration. Mr. Okuo now has a criminal record for the first time in his life, and as a convicted felon, he is deportable under the

---

[9] Sered, Danielle, *Until We Reckon, Violence Mass Incarceration and the Road to Repair*. New York: The New Press, at 89-90.

Immigration and Nationality Act. See INA § 101(a)(43), 8 USC § 1101(a)(43).[10] The First Circuit has held that "a sentencing court has the discretion, in an appropriate case, to weigh the possibility of future deportation when mulling the section 3553(a) factors in an effort to fashion a condign sentence." *Hercules*, 947 F.3d at 9. A defendant's potential deportation is relevant to several § 3553(a) factors. *Id.* First, "a defendant's potential deportation may properly be considered as part of a broader assessment of his history and characteristics pursuant to section 3553(a)(1)." *Id.* Second, "a defendant's potential deportation . . . may prove relevant to whether a sentence will adequately 'protect the public from further crimes of the defendant.'" *Id.*, quoting 18 U.S.C. § 3553(a)(2)(C). Third, "[f]uture threats to the community might conceivably be mitigated in a situation in which, upon release from imprisonment, the defendant will promptly be deported." *Hercules*, 947 F.3d at 9, citing *United States v. Morales-Uribe*, 470 F.3d 1282, 1287 (8th Cir. 2006).

As a result of his immigration status, which the BOP treats as a public safety factor, Mr. Okuo will face harsher and more restrictive terms of incarceration.[11]

---

[10] In addition, as a non-citizen his aggravated felony convictions render him ineligible for various forms of relief from removal, he is subject to mandatory immigration detention and is ineligible for a bond hearing, warrant cancelation, and is barred from making an asylum claim, and he will be permanently barred from re-entering the United States. *See id.* § 1229b(a)(3) (cancellation of removal); id. § 1231(b)(3)(B)(ii) (withholding of removal); id. §1158(b)(2)(A)(ii), (B)(i) (asylum); 8 U.S.C. § 1182(a)(9)(A) (permanent bar on re-entry).

[11] U.S. Bureau of Prisons Program Statement 5100.08, *Inmate Security Designation and Custody Classification*, ch. 5, at 9 (Sept. 4, 2019), available at https://www.bop.gov/policy/progstat/5100_008cn.pdf. This results in harsher and more restrictive terms of incarceration. *See* National Immigration Project, *Public Comment on Proposed Amendments re: Immigration Consequences, Cultural Assimilation, and Recency (75 Fed. Reg. 3525, Jan. 21, 2010)*, at 2-3 (Mar. 22, 2010), available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20100317/National%20immigrationProject.pdf [hereafter "NIP Public Comment"]. "The physical reality of a higher security facility has serious detrimental [e]ffects on a prisoner's mental health[.]" *Id.* at 3. The National Immigration Project noted that these detrimental effects include, but are not limited to, an inability to obtain outside work assignments, restrictions

Following completion of his term of incarceration in the BOP, he will be further detained in an ICE facility, where he will remain until he is ultimately deported.[12] Further, any risk to citizens of the United States (had there be one) will be eliminated when he deported, making concerns regarding specific deterrence and incapacitation less relevant.

As the Court recognized in *Hercules*, the fact that he will be promptly deported also helps to address will advance the "protection of the public" concerns. *Id*; 18 U.S.C §3553(a)(1)(C). The Government will likely suggest that with this type of crime, that crosses borders, deportation will serve no incapacitation concerns. However, Mr. Okuo was a small player in the international scheme. His value to the enterprise was limited simply to his access to American banks. That access will be removed when he is deported. Perhaps more important to protecting the public is Mr. Okuo's deepening understanding of the harm he has caused. Due to his role in this offense – money in and money out – it was easy for Mr. Okuo to distance himself from the humanity on the other end of the crimes. While of course he should have appreciated this through the impact of his crimes, he had not. He has now

---

on access to mail, limited ability to have contact visits with family members, and limited or no access to occupational and educational programs. *Id*. at 2-3.

[12] On completion of his sentence, Mr. Okuo will be immediately transferred into ICE custody, pending his inevitable deportation. *See Bado v. United States*, 186 A.3d 1243, 1254 & n.22 (D.C. Cir. 2018) (individual who is not legal permanent resident convicted of aggravated felony subject to mandatory detention pending removal proceedings and during period between time order of removal is entered and when individual is actually removed) (*citing* 8 U.S.C. § 1231(a)(2)). Furthermore, ICE may detain Mr. Okuo for six months or more. *See Reid*, 17 F.4th at 4 (no per se constitutional entitlement to bond hearing after six months of ICE detention while awaiting deportation). *See also Alphonse v. Moniz*, No. 21-11844-FDS, 2022 WL 10480100, slip op. at 4-5 (D. Mass. Oct. 17, 2022) (detention under § 1226(c) for more than one year likely to be unreasonable; likely violation of due process rights where individual was detained pending deportation without bond hearing for nearly twenty-two months).

been fully confronted, through the evidence, conversations with counsel, the government's filings, and the victim's own words with the individual harms his transactions played a role in. Engagement with that reality has filled him with what he describes as "shame and disgrace." That reality will do more to protect the public than warehousing him.

### b. A sentence longer than 46 months would do nothing to advance specific or general deterrence concerns, and in fact may subvert them.

The requested sentence sufficiently advances the need to afford adequate deterrence of criminal conduct when imposing a sentence pursuant to 18 U.S.C. § 3553(a). However, while system actors – courts, prosecutors, and even defense attorneys – continue to operate as if deterrence can be achieved through longer carceral sentences, researchers have concluded that long prison sentences afford little, if any, deterrent value.[13] For instance, a 2013 meta-analysis of studies on deterrence overwhelmingly concluded that "it is clear that lengthy prison sentences cannot be justified on a deterrence-based, crime-prevention basis."[14]

Rather, leading deterrence scholars for the past two centuries have overwhelmingly found that both specific and general deterrence is primarily a

---

[13] *See* Martha Nelson et al., *A New Paradigm for Sentencing in the United* States, VERA INST. OF JUST. 23 (Feb. 2023), available at https://www.vera.org/downloads/publications/Vera-Sentencing-Report-2023.pdf; Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, 87 UMKC L. Rev. 113, 121,123-124 (2018); NAT'L INST. OF JUST., *Five Things About Deterrence* 1-2 (May 2016), available at https://www.ojp.gov/pdffiles1/nij/247350.pdf; *Long Prison Terms*, JUST. POL'Y INST., https://justicepolicy.org/long-prison-terms/ (last visited Feb. 9, 2023).
[14] Id. at 23, citing Daniel S. Nagin, *Deterrence in the Twenty-First Century*, *in* 42 CRIME & JUST. 199, 202 (Michael Tonry, ed., 2013).

function of the *certainty of apprehension*, not the severity of the punishment.[15] Increasing prison term's length reduces recidivism by a negligible amount, if at all.[16] And while increasing a sentence length yields does little to improve deterrence related outcomes, longer sentences ratchet up the undesirable consequences associated with imprisonment; incapacitating an individual long past what is required by public safety, impose serious and avoidable financial and public health costs in the process, and potentially creating a greater long-run risk of reoffending.[17]

Particularly with regards to *specific deterrence*, research reveals that the experience of incarceration may produce a perverse outcome, increasing rather than decreasing recidivism.[18] Evidence of a specific deterrence effect is scant.[19] Instead, most studies find that incarceration has no effect on recidivism or instead, an

---

[15] *See* Nelson et al., *supra* note 13, at 23; Daniel Nagin, *Incarceration & Public Safety*, ARNOLD VENTURES 4-5 (July 2022), available at
https://craftmediabucket.s3.amazonaws.com/uploads/AVCJIReport_IncarcarationPublicSafety_Nagin_v2.pdf; Maurice J.G. Bun et al., *Crime, Deterrence and Punishment Revisited*, 59 Empirical Econ. 2303, 2329 (2019).
[16] *See* William Rhodes et al., *Relationship Between Prison Length of Stay and Recidivism: A Study Using Regression Discontinuity and Instrumental Variables with Multiple Break Points*, 17 Criminology & Pub. Pol'y 731, 733, 758 (2018); *Long Prison Terms*, *supra* note 1.
*See also* Susan Howley, *Reflections on Long Prison Sentences: Conversations with Crime Survivors, Formerly Incarcerated People, and Family Members*, COUNCIL ON CRIM. JUST.: TASK FORCE ON LONG SENTENCES 6 (Jan. 2023), available at https://assets.foleon.com/eu-west-2/uploads-7e3kk3/41697/reflections_on_long_prison_sentences_-_howley.4d54a984fb61.pdf.
[17] *See* Special Directive 20-08 from George Gascón, LA Dist. Att'y to All Deputy Dist. Att'ys 3 (Dec. 7, 2022), available at https://da.lacounty.gov/sites/default/files/pdf/special-directive-20-08.pdf; Nelson et al., *supra* note 1, at 28 ("Incarceration breeds disruption and makes communities less safe.").
[18] *See* Nagin, *supra* note 14, at 4.
[19] *Id. See generally* Daniel S. Nagin et al., *Imprisonment and Reoffending*, *in* 38 CRIME & JUST. 115 (Michael Tonry, ed., 2009); Charles Loeffler & Daniel S. Nagin, *The Impact of Incarceration on Recidivism*, *in* 5 ANN. REV. OF CRIMINOLOGY 133 (Tracey L. Meares & Robert J. Sampson, eds., 2022); Damon M. Petrich et al., *Custodial Sanctions and Reoffending: A Meta-Analytic Review*, *in* 50 CRIME & JUST. 353 (Michael Tonry, ed., 2021).

aggravating criminogenic effect.[20] Imprisonment and overly punitive sentences can increase future offending for a host of reasons, including the associated stigma of a criminal record that complicates the process of reintegration and restricts access to housing and career opportunities, the atrophy of skills for effective functioning in legal labor markets while incarcerated, and the erosion of bonds during incarceration with non-criminally involved family, friends, and support networks.[21] The social experience of living within a prison setting for an extended period of time can also amplify criminal tendencies of released offenders, and in turn, increase recidivism, insofar as individuals are perpetually surrounded by and affiliate with other inmates from whom they may acquire criminogenic attitudes, beliefs, or behaviors.[22]

This is not to suggest that the *prosecution and arrest* of Mr. Okuo may not have some deterrent value; rather, it is simply that that work is now substantially done. Adding months to his sentence will yield little productive deterrent effect,

---

[20] Nagin, *supra* note 14, at 4. See Loeffler & Nagin, *supra* note 19, at 133 ("A smaller number of studies do, however, find significant effects, both positive and negative. The negative, recidivism-reducing effects are mostly in settings in which rehabilitative programming is emphasized and the positive, criminogenic effects are found in settings in which such programming is not emphasized.").
[21] Nagin, *supra* note 14, at 2; Jennifer E. Copp, *The Impact of Incarceration on the Risk of Violent Recidivism,* 103 Marq. L. Rev. 775, 780-781 (2020), available at https://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=5440&context=mulr; Nelson et al., *supra* note 1, at 29 ("[C]ustodial sentences not only do not prevent reoffending, but they can also actually increase it… [T]he prison environment, separation from community, or even the process of returning to the community is so destabilizing that it increases the likelihood of continued encounters with the criminal legal system.").
[22] *See* Nelson et al., *supra* note 13, at 29; NAT'L INST. OF JUST., *supra* note 13, at 1; Rhodes et al., *supra* note 15, at 734 ("Other criminologists argue that prisons are schools for crime where inmates learn how to become more knowledgeable offenders. There is also ethno-graphic research with results showing how prisons reinforce cultural values conforming to criminal activity; that is, offenders import these values from their community, and deviant values are reinforced by the structure and organization of prison."); Copp, *supra* note 21, at 780.

may have a deleterious impact on specific deterrence concerns, and would expend unnecessary tax-payer resources.[23]

In further considering the issue of specific deterrence, Mr. Okuo does not pose a cognizable risk of danger to the community or of recidivism. Upon completing his sentence, he will return to Nigeria. It is not unreasonable to suggest that Mr. Okuo's arrest and the subsequent years of confinement alone provided adequate specific deterrence from future offending. A first-time offender with no prior exposure to the criminal justice system or to being incarcerated, Mr. Okuo has paid a substantial price for a non-violent, non-drug offense. Simply stated, if the only concerns were only protection of the public and specific deterrence, deportation alone – skipping several years of warehousing at the taxpayer's expense – would be the most appropriate sentence.

Regarding general deterrence, the threat of punishment may prevent crime by causing people to refrain from engaging in unlawful behavior out of fear of being punished.[24] Extending this concept of deterrence seems intuitive: the more dire the threatened punishment, the more effective it should be at discouraging people from committing crimes. Deterrence theory was part of the rationale for lengthening and increasing the surety of sentences to incarceration through the expansion of mandatory minimums in the 1980s and 1990s.[25]

---

[23] *See* Presentence Investigation Report, ¶194.

[24] Nagin, *supra* note 14, at 5.

[25] *See* Nelson et al., *supra* note 13, at 23. For example, in 1994, California Governor Pete Wilson said about the state's new three strikes law: "I'm convinced that if we are sending clear messages to career criminals, we will begin to see them reform their conduct." *See* Daniel Weintraub, '3 Strikes Law' Goes into Effect," L.A. TIMES (March 8, 1994), available at https://perma.cc/WU2F-EW6L. https://www.latimes.com/archives/la-xpm-1994-03-08-la-me-threestrikes-wilson-samuel-timeline-story.html.

Study after study, though, has shown that people do not order their unlawful behavior around the *harshness* of sentences they may face, but around their perceived likelihood of being caught and facing any sentence.[26] This theory originated over two centuries ago: "One of the greatest curbs on crime is not the cruelty of punishments, but their infallibility.... The certainty of punishment even if moderate will always make a stronger impression."[27] Contemporary research continues to support this principle – that certainty of detection matters over severity of sanction. This is due to several factors.  First, the general public's knowledge of, or even an individual's familiarity with, the specific criminal sanctions set by legislatures is often limited at best.[28] Second, most people are deterred from engaging in unlawful behavior not because they fear a particular sanction but simply because they know the behavior is prohibited.[29] Studies of the impact of increasing sentence severity generally find no evidence of a deterrent effect or, at most, a modest effect.[30] In contrast, literature analyzing the impact of increasing police numbers or their strategic deployment, for example in areas experiencing high concentrations of criminalized behavior, consistently find a deterrent effect.[31]

---

[26] *See* Nelson et al., *supra* note 13, at 23; Nagin, *supra* note 14.

[27] Nagin, *supra* note 14, at 5.

[28] *See* Nelson et al., *supra* note 13, at 23; Michael Cholbi, *Harsh Justice: Why Doesn't Increasing the Severity of Punishment Lead to Less Crime?*, PSYCH. TODAY (Sept. 13, 2015), available at https://www.psychologytoday.com/us/blog/ethics-in-question/201509/harsh-justice.

[29] *See* Nelson et al., *supra* note 13, at 23; NAT'L INST. OF JUST., *supra* note 13.

[30] Nagin, *supra* note 14, at 5; *See generally* NAT'L RSCH. COUNCIL, THE GROWTH OF INCARCERATION IN THE UNITED STATES: EXPLORING CAUSES AND CONSEQUENCES (Jeremy Travis et al. eds., National Academies Press 2014), available at https://www.njjn.org/uploads/digital-library/Nat-Academies-Press_Growth-of-Incarceration-in-US_Oct-2014.pdf

[31] Nagin, *supra* note 14, at 5; NAT'L INST. OF JUST., *supra* note 13, at 1.

Here, the work of deterring Mr. Okuo, and others like him, has already been done. He has served two years in jail, and he will be deported at the end of his sentence. A longer sentence will do absolutely nothing to advance larger deterrence concerns, and the costs associated with further incarceration will likely significantly outstrip any benefits, general or specific.

### c. A sentence longer than 46 months would not have any rehabilitative value.

Additionally, there is also no rehabilitative value for a sentence any longer than that proposed. 18 U.S.C §3553(a)(1)(D). Indeed, Congress itself has "recognize[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582(a). Mr. Okuo has no mental illness, nor long-term and serious substance use disorder history that requires treatment under supervision, and as a "deportable alien," he will not be eligible for placement in a residential re-entry center. *See* BOP Program Statement 7310.04 at 10.

### d. The requested sentence would not create unwarranted sentencing disparities.

A sentence of 46 months is consistent with sentences imposed on other defendants within the District of Massachusetts who have engaged in similar scams or online frauds and serves the purpose of avoiding unwarranted disparities between defendants. § 18 U.S.C. 3553(a)(6).

In *United States v. Musau*, 21-CR-10190-ADB, Mr. Okuo's co-conspirator recently received a sentence of 44 months – the amount recommended by the Government, which was below her calculated range of 51 -63 months. Notably, Ms.

Musau was a somewhat truculent defendant. In February 2022, Musau filed a letter to the Court and a *pro se* motion to withdraw her guilty plea, which contained several false or misleading statements. *See* 21-CR-10190-ADB Dkts. 73, 74. Ms. Musau eventually opted to go forward with sentencing, but only after a series of status conferences, multiple appointments of counsel (Musau was on her fourth attorney at the time of sentencing, and three of her four attorneys were CJA appointed), and the government's production of complete post-plea discovery.

In *United States v. Iyalekhue*, 20-CR-10208-RWZ, the defendant pleaded guilty to an information charging one count of conspiracy to commit mail and wire fraud and one count of money laundering in connection with the scheme. Iyalekhue opened 10 fraudulent accounts and his loss amount was $813,000. Iyalekhue was sentenced to 63 months in prison, the low end of his sentencing range.[32]

In *United States v. Balogun*, 19-CR-10230-DPW, the defendant pleaded to an indictment charging him with money laundering associated with a comparable romance scheme where he had opened a fraudulent account and the intended loss was in the range of $550,000. Balogun was sentenced by Judge Woodlock to 42 months, slightly below the low end of his sentencing range.

In *United States v. Adepoju*, 21-CR-10207-PBS, the defendant pleaded guilty to an information charging conspiracy to commit wire fraud, aggravated identify theft, and money laundering, in connection with a wide-ranging scheme that involved unemployment and COVID benefits fraud, romance scams, and unlawful impersonation. Mr. Adepoju was sentenced to a total of 48 months, 24 months for

---

[32] Unlike Okuo, Iyalekhue had a criminal history which increased his Guidelines range.

the fraud and money laundering, and the 24-month mandatory sentence for the aggravated identity theft.

In *United States v. Osemwegie*, 21-CR-10219-DJC, the defendant pleaded guilty to an information charging him with conspiracy to commit bank and wire fraud. Osemwegie used multiple aliases and was accountable for intended losses of approximately $686,000. Osemwegie's was sentenced him to 32 months, well below the sentence advocated for by the Government of 46 months

In *United States v. Iwaunyanwu*, 19-CR-10119-DJC, the defendant pled guilty to the six-count indictment charging him with conspiracy to commit wire fraud, two counts of wire fraud, conspiracy to commit mail and wire fraud, mail fraud, and money laundering. The estimated losses attributable to Mr. Iwaunyanwu from his romance and "business email compromise" schemes totaled approximately $908,000. Citing a motive of "purely personal gain" pointing "toward the highest degree of culpability", the Government sought a sentence of 48 months. See 1:19-cr-10119 Doc. 199 (Gov't Sent. Memo.) at 14-15. The court imposed a sentence of 30 months.[33] See Doc. 211.

Finally, in *United States v. Osei*, 21-CR-10064-IT, the defendant pleaded guilty to a 15-count indictment, charging false statements to a bank, wire fraud, aiding and abetting wire fraud, and money laundering. During an estimated four year period, Osei participated in a scheme to steal more than $10 million from

---

[33] The government sought a guidelines range sentence, between six to 12 months, for Mr. Iwaunyanwu's co-defendant, Larry Brown. *United States v. Brown*, 1:19-cr-10119 Doc. 112 (Sent. T'scpt of Larry Brown) at 20. The Court imposed a sentence of time served, noting that Mr. Bird had served 10 months while awaiting federal sentencing, on a state matter, with three years' supervised release. Id. at 31-32.

hundreds of romance scam victims. The government described Osei as the "most prolific of the U.S.-based money launderers" participating in the scheme, who used fake passports to open at least 77 bank accounts into which victims sent more than $4 million in funds[34]. 21-CR-10064 doc. 90 (Gov't Sent. Memo.) at 1. Osei's guideline range was 108-135 months, Id. at 4, and the Government sought a sentence of 108 months, arguing that a guidelines-range sentence was appropriate given the length and complexity of the scheme and Osei's "prolonged willingness to engage in an exploitation of victims for the sake of personal profit." Id at 7. Defense counsel sought a sentence of time-served. 21-CR-10064 doc. 91 (Def's Sent. Memo.) at 1. Mr. Osei was sentenced to 54 months, half of the low-end of the guideline range months.

Comparison to other cases is always a difficult task because of the individual and unique characteristics of every case. Additionally, Mr. Okuo, unlike the majority of defendants above, was not convicted of money laundering conduct. Furthermore, Mr. Okuo is not a citizen – unlike at least some of the defendants compared above – and faces the significant collateral consequence of deportation. The recommended sentence of 46 months satisfies the law's requirement to impose a sentence that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §3553(a)(6).

## CONCLUSION

Mr. Okuo's role in the scam conspiracy is not to be minimized, but neither should the Court lose sight of his many promising and laudable traits. A sentence of

---

[34] Osei was ordered to pay 4.12 million in restitution.

46 months is sufficient, balancing the serious nature of the crime and deterrence

concerns against Mr. Okuo's background and circumstances, the serious collateral

consequence he faces as a result of conviction, and the low risk of recidivism he

poses.

> Respectfully Submitted
> Defendant Mark Okuo
> By his attorney,
>
> /s/ Jessica D. Hedges
> Jessica D. Hedges (BBO No. 645847)
> HEDGES & TUMPOSKY LLP
> 88 Broad St., Suite 101
> Boston, MA 02109
> T)617/722-8220

## CERTIFICATE OF SERVICE

I, Jessica D. Hedges, hereby certify that on this 7th day of April, 2023, I served one true and correct copy of this memorandum via electronic filing to all parties in this matter.

> /s/ Jessica Hedges
> Jessica D. Hedges